# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1420

_____

| | | |
|---|---|---|
| Anna Botz, formerly known as<br>Anna Hollenkamp, | * <br> * <br> * | |
| Appellant, | * <br> * | Appeal from the United States<br>District Court for the |
| v. | * <br> * | District of Minnesota. |
| Omni Air International, | * <br> * | |
| Appellee. | * | |

_____

Submitted: October 19, 2001
Filed: April 5, 2002

_____

Before BOWMAN, RICHARD S. ARNOLD, and HANSEN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Omni Air International, Inc. terminated Anna Botz's employment as a flight attendant in July 2000 after she refused a flight assignment that she believed violated federal safety regulations. Botz filed the instant action in a Minnesota state court alleging that Omni violated Minnesota's whistleblower statute, Minn. Stat. § 181.931-.935 (2000 & Supp. 2001), by discharging her in retaliation for refusing the assignment and for reporting the alleged safety violation to Omni. Omni invoked

federal diversity jurisdiction and removed Botz's action to the District Court.[1]  Omni then moved to dismiss the action for failure to state a claim upon which relief can be granted, arguing that the state whistleblower provisions were both expressly and impliedly pre-empted by the Airline Deregulation Act of 1978[2] (ADA) and the Whistleblower Protection Program (the Program or WPP) of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No. 106-181, § 519(a), 114 Stat. 61, 145-49 (2000) (to be codified as 49 U.S.C. § 42121).  The District Court agreed that Botz's claims were pre-empted and granted Omni's motion to dismiss.  Because we conclude that the ADA expressly pre-empts Botz's claims under the Minnesota whistleblower statute, we affirm.

I.

For purposes of our review, we accept as true the factual allegations in Botz's complaint.  See Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996), cert. denied, 519 U.S. 1149 (1997).  Omni employed Botz as a flight attendant from May 1999 until her July 2000 discharge.  In January 2000, Omni assigned Botz to work both legs of a round-trip flight from Alaska to Japan.   She believed when she received this assignment that it would require her to violate a restriction in the Federal Aviation Regulations (FAR) limiting a flight attendant's "duty period" to no longer than twenty hours.  See 14 C.F.R. § 121.467 (2001).  Botz nevertheless apparently completed the January 2000 round trip without incident or controversy but, upon her return, contacted an employee at the Federal Aviation Administration, Cabin Safety Division (FAA-CSD), who told her that in his opinion the assignment did indeed violate the FAR.  Botz took no immediate steps to follow up on this information.

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

[2]The Airline Deregulation Act of 1978 (ADA), Pub. L. No. 95-504, 92 Stat. 1705, is codified as amended in scattered sections of 49 U.S.C., including, as pertinent here, §§ 40101, 40120, and 41713.

At an Omni employee meeting on July 7, 2000, Botz was again assigned the Alaska-to-Japan round trip. She objected, asserting that it violated the FAR. In response, Omni's corporate scheduler faxed a copy of an excerpt of the FAR to Omni's flight supervisor during the employee meeting. The flight supervisor concluded that the assignment did not violate the FAR. Botz attempted after the meeting to contact the same FAA-CSD employee with whom she had spoken earlier that year, but she was unable to reach him.

Botz nevertheless informed Omni on July 8, 2000, that she would refuse the assignment because she believed it violated the FAR. On July 12, 2000, Botz met with Omni representatives who informed her that her refusal was grounds for termination. She, in turn, presented to Omni's representatives the information she had received earlier in 2000 from the FAA-CSD employee and asked Omni's representatives to contact him. Botz also offered to carry out her disputed assignment without further objection if the FAA-CSD employee confirmed the opinion of Omni's flight supervisor that the assignment did not violate the FAR. Omni's representatives told Botz they would take seventy-two hours to consider her request. On July 14, 2000, Omni informed Botz that she had been discharged for insubordination and refusal to accept an assignment.

Botz then filed this suit in the Hennepin County (Minnesota) District Court claiming that her discharge violated the Minnesota whistleblower statute, see Minn. Stat. § 181.932, subd. 1(a), (c), because Omni discharged her for, she alleges, refusing the flight assignment and for reporting to Omni what she suspected[3] was a violation of the FAR. Omni removed the suit to the District Court, invoking federal diversity jurisdiction, and moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[3]Nothing in the record definitively establishes that the flight assignment refused by Botz violated the Federal Aviation Regulations.

We review the District Court's grant of Omni's 12(b)(6) motion to dismiss de novo. See Hafley, 90 F.3d at 266. We construe her complaint in the light most favorable to her and determine whether she can prove any set of facts that would entitle her to relief. Id.

## II.

Our task is to determine whether the ADA, as amended by the WPP, pre-empts Botz's claims under the Minnesota whistleblower statute. For our purposes here, then, the key feature of the ADA is its pre-emption provision. The provision states, in pertinent part:

> [A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier . . . .

49 U.S.C. § 41713(b)(1) (1994).[4] The ADA also includes a savings clause: "A remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120(c) (1994). The Supreme Court has referred to this as a general "remedies" savings clause and deemed it "a relic of the pre-ADA/no pre-emption regime." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 385 (1992). Botz nevertheless relies in part upon the existence of this savings clause to support her argument that the ADA does not expressly pre-empt her claims.

---

[4]The Supreme Court has decided two cases regarding the interpretation, scope, and application of the ADA's pre-emption provision. Am. Airlines, Inc. v. Wolens, 513 U.S. 219 (1995); Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992).

Omni's express and implied pre-emption arguments, in turn, rely in part upon Congress's enactment of the WPP in 2000.[5] The Program protects air-carrier employees who report actual or alleged air-carrier safety violations or who file proceedings regarding actual or alleged air-carrier safety violations. The Program is a detailed and comprehensive regulatory scheme. It specifies four classes of protected employee conduct, prescribes both the evidentiary and legal standards the Secretary of Labor must use to determine whether a violation has occurred and the remedy to be ordered, coordinates the duties and involvement of two separate federal agencies, and even includes modest penalties to deter unfounded or inequitable complaints. The Program protects employees from retaliation by their employers for a variety of "whistleblowing conduct" based on any actual or alleged federal air-safety violation.

Botz bases her claims on two provisions of the Minnesota whistleblower statute that protect an employee who in good faith reports a possible violation of any law or who refuses any assignment that she has an objective, factual basis to believe violates any law.[6] See Minn. Stat. § 181.932, subd. 1(a), (c). The statute forbids any

---

[5]The Whistleblower Protection Program applies to fiscal years beginning after September 30, 1999. See Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No. 106-181, § 3, 114 Stat. 61, 64 (2000) (to be codified as 49 U.S.C. § 106 note). Botz filed her original complaint in September 2000.

[6]The excerpt from the Minnesota whistleblower statute set forth below includes the two paragraphs that Omni allegedly violated.

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (a) the employee, . . . , in good faith, reports a violation or suspected violation of any federal or state law or rule . . . to an employer or to any governmental body or law enforcement official; [or]

employer from taking an adverse employment action against an employee—such as disciplining, demoting, or discharging him—in retaliation for the employee's whistleblowing conduct and grants a civil cause of action with its customary legal and equitable remedies to an employee who is so injured.  See id. §§ 181.932, .935.

Although Omni argued before the District Court both express and implied theories of pre-emption, the court did not analyze Omni's implied pre-emption argument because it ultimately concluded that Botz's Minnesota whistleblower claims were expressly pre-empted by the ADA.  In determining whether Botz's Minnesota whistleblower claims fell within the scope of the claims Congress intended the ADA to pre-empt, the District Court looked first to the plain language of the provision, noting that it must be interpreted in context and in light of the overall statutory scheme.  The court acknowledged that the Supreme Court in Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992), gave the phrase "related to" a very broad meaning, then focused on the service that a flight attendant provides.  Because the length of a flight attendant's duty period has a significant effect upon the service he provides, any attempt to conceal violations of the FAR's duty-period restrictions would "seriously compromise the service that an air carrier provides."  Botz v. Omni Air Int'l, 134 F. Supp.2d 1042, 1047 (D. Minn. 2001).  The court concluded that the plain language of § 41713(b)(1) pre-empted Botz's claims.

Turning to the evidence of congressional intent provided by the context and structure of the statutory scheme, the District Court noted that congressional

---

. . .

(c) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation . . . , and the employee informs the employer that the order is being refused for that reason . . . .

Minn. Stat. § 181.932, subd. 1 (2000).

air-safety policy, when coupled with the WPP's comprehensive scheme for protecting whistleblowers who report possible safety violations, provided additional evidence that Congress intended to "pre-empt state whistleblower claims based on safety violations." Botz, 134 F. Supp.2d at 1049. The District Court distinguished the handful of cases Botz cited that had held that the ADA did not pre-empt state whistleblower claims on the ground that these cases were all decided before Congress enacted the WPP, when the evidence of Congress's intent to pre-empt state whistleblower claims was "scant."

III.

In analyzing the pre-emptive effect of a statutory scheme such as the ADA, our ultimate touchstone is the purpose of Congress. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992). We "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985); accord Morales, 504 U.S. at 383. We do not lightly infer pre-emption in the area of employment law, for it "falls within the traditional police power of the State." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 21 (1987); accord Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994) (analyzing the pre-emptive effect of a federal act upon state-law wrongful discharge remedies). We therefore start with the assumption that the States' historic police powers are not to be superseded, "[b]ut that presumption can be overcome where . . . Congress has made clear its desire for pre-emption." Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 151 (2001); accord Rice v. Sante Fe Elevator Corp., 331 U.S. 218, 230 (1947).

Congress may evince its intent to pre-empt state law either implicitly or explicitly. Cipollone, 505 U.S. at 516. As we have already noted, Omni argues theories of both implied and express pre-emption. We ordinarily do not consider theories of implied pre-emption where, as here, "Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly

-7-

addressing that issue." Id. at 517. Because we conclude that the ordinary meaning of the language of the ADA's pre-emption provision adequately demonstrates Congress's intent to pre-empt Botz's claims under the Minnesota whistleblower statute, we find no need to consider Omni's implied pre-emption arguments.

Heeding the Supreme Court's guidance, we begin our express pre-emption analysis with the plain language of the ADA's pre-emption provision, giving effect to the provision's plain language "'unless there is good reason to believe Congress intended the language to have some more restrictive meaning.'" Id. at 521-22 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97 (1983)). Because Congress has given us an express pre-emption provision, "our task is to identify the domain expressly pre-empted." Lorillard Tobacco Co. v. Reilly, 121 S. Ct. 2404, 2414 (2001). More precisely, we must determine whether that domain encompasses Botz's claim.

The ADA's pre-emption provision defines the segment of interstate commerce in which a State's attempt to "enact or enforce a law" (here, the Minnesota whistleblower statute) will be prohibited: any state enforcement action or enactment "related to a price, route, or service of an air carrier." The phrase "related to" itself is, to understate the point, neither narrow nor restrictive. As the Supreme Court noted in Morales,[7] these words ordinarily have a broad meaning: "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" 504 U.S. at 383 (quoting Black's Law Dictionary 1158 (5th Ed. 1979)). Although Congress could easily have selected more restrictive terminology

---

[7]The ADA pre-emption provision that the Supreme Court was considering in Morales was 49 U.S.C. App. § 1305(a)(1), the predecessor to current § 41713(b)(1). Section 1305 used slightly different language, including referring to air carrier "rates" rather than the current provision's reference to a "price." The Court noted in Wolens, however, that "Congress intended the revision to make no substantive change." 513 U.S. at 223 n.1. We therefore treat the terms as perfect synonyms throughout this opinion.

to describe the type of state enforcement action or enactment the ADA pre-empts, the provision as written is without language that would produce a more limited pre-emptive effect.

Though by no means self-defining, the phrase "a price, route, or service of an air carrier" is similarly broad. Congress did not choose to restrict the scope of the word list "price, route, or service" by using the kind of qualifying words or phrases that would have made the list's three terms more definite or focused. Thus, it is apparent from the pre-emption provision's plain language that it has a broad pre-emptive effect on state law claims involving air-carrier prices, routes, or services.

We are, however, also guided by the Supreme Court's explicit determinations that the ADA's pre-emption provision has a broad scope. The Court in Morales noted that the pre-emption provision's "related to" language is identical to language that performs a similar function in ERISA's express pre-emption provision, language which the Court had previously determined had a "broad scope" and "expansive sweep." Id. at 383-84. Because the language is identical, the Court therefore adopted and adapted from its ERISA express pre-emption decisions a standard for interpreting the ADA's provision: Section 41713(b)(1) expressly pre-empts "[s]tate enforcement actions having a connection with or reference to" airline prices, routes, or services. Id. at 384.

While re-emphasizing the provision's broad reach, the Court in American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), refined and applied the standard it had developed in Morales. The Court strongly suggested that the ADA pre-emption provision's "ban on enacting or enforcing any law 'relating to rates, routes, or services' is most sensibly read, in light of the ADA's overarching deregulatory purpose, to mean 'States may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier.'" Id. at 229 n.5 (quoting Brief for United States as *Amicus Curiae* at 16).

-9-

When applied to the facts surrounding Botz's discharge, the Minnesota whistleblower statute has a forbidden connection with air-carrier services. It includes broad authorization to flight attendants to refuse assignments, jeopardizing an air carrier's ability to complete its scheduled flights. The FAR set standards for the minimum number of flight attendants that must be on board and available to serve passengers and execute safety procedures. See 14 C.F.R. § 121.391 (2001) (specifying the minimum number of flight attendants required during flight for each of several classes of passenger aircraft); id. § 121.392 (specifying same for periods during which aircraft are on the ground but passengers are on board). Thus, an air carrier is unauthorized to fly or even board passengers if an aircraft's crew does not include the proper number of flight attendants. An air carrier that is confronted with a flight attendant's refusal to serve on a flight to which he has been assigned has at least two obvious options for dealing with the scheduled flight. It can replace the refusing flight attendant with another flight attendant it employs, or, if it is unable to replace him in time, it can cancel the flight to comply with the FAR prescriptions of the minimum number of flight attendants and reschedule the ticketed passengers onto other flights.

A large air carrier employing hundreds of flight attendants might encounter few difficulties replacing a refusing flight attendant, assuming, that is, that the flight attendant provides the carrier with notice of his refusal sufficiently in advance of the flight's scheduled departure. Replacing a flight attendant even with a few days notice might prove problematic or even impossible, however, for a small carrier with relatively few flight attendants. For any size carrier, a significant likelihood exists that the carrier will have to cancel the flight in order to comply with the FAR's flight-attendant staffing regulations. This is patently true when the flight attendant refuses the assignment within a few hours of the flight's scheduled departure. On that day at least, the air carrier will not be providing the service for which its customers have paid at one of its scheduled times. An air carrier cannot avoid this possibility even by adhering to every law, rule, and regulation—federal and state, for the Minnesota whistleblower statute authorizes refusals based on the flight attendant's objective,

-10-

fact-based belief alone that the assignment is violative. This authorization to refuse assignments, and the protections that the whistleblower statute provides, have a forbidden connection with an air carrier's service under any reasonable interpretation of Congress's use of the word "service." Compare, e.g., Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1265-66 (9th Cir. 1998) (en banc) (holding that "service" in the ADA's pre-emption provision, "when juxtaposed to 'rates' and 'routes,' refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided"), with Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (holding that "services" refers to elements of "'the contractual arrangement between the airline and the user of the service,'" including "'items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself'" (quoting Hodges v. Delta Airlines, Inc., 4 F.3d 350, 354 (5th Cir. 1993)).

The Minnesota whistleblower statute's connection with air-carrier services is quite similar to the connection discussed in Morales between air-carrier prices and the uniform state advertising guidelines that were there under consideration. Both relate to the pre-empted domain of air-carrier prices, routes, and services indirectly. The guidelines in Morales affected air-carrier prices by restricting and regulating advertising. The Minnesota whistleblower statute affects air-carrier service by authorizing a flight attendant to refuse assignments and protecting her when she does. Both are States' attempts to impose their own public policies or regulatory theories on an air carrier's operations, an imposition that Congress intended the ADA to pre-empt. See Wolens, 513 U.S. at 229 n.5. The statute's authorization to refuse assignments is not limited to actual violations. Rather, it extends to any assignment which the flight attendant has an objective, factual basis merely to believe is in violation. Neither does the statute set any limitation upon the circumstances surrounding the refusal: it authorizes a flight attendant to refuse an assignment in any place, at any time. Although, as Botz points out, no language of the Minnesota whistleblower statute is directed at the air industry and the statute is in that respect unlike the guidelines in Morales, the state consumer fraud act the Court in Wolens

-11-

held expressly pre-empted was also a statute of general applicability without reference to the air industry. See id. at 227; see also Morales, 504 U.S. at 386 (concluding that, by analogy with the Court's ERISA express pre-emption doctrine, a state law may relate to air-carrier prices, routes, or services and thus be pre-empted even if the law is not specifically designed to affect prices, routes, or services).

Botz argues that her claims are sheltered from pre-emption by the ADA's savings clause. See 49 U.S.C. § 40120(c). We disagree. As noted supra, this savings clause is a general remedies savings clause and "is a relic of the pre-ADA/no pre-emption regime." Morales, 504 U.S. at 385. It came into play in Wolens only as a sort of "safe haven" from pre-emption for causes of action based on privately-ordered obligations voluntarily undertaken by the parties themselves. The Morales Court had already held that it will not allow this general "remedies" savings clause to undermine the effect of the ADA's express pre-emption provision. 504 U.S. at 385 ("'[W]e do not believe Congress intended to undermine this carefully drawn statute through a general saving clause.'" (quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987))). It would, moreover, be implausible to suggest that the protections the Minnesota whistleblower statute grants to air-carrier employees are obligations the carriers themselves have undertaken.

Botz also argues that her claims are too tenuously and remotely connected with prices, routes, or services to be pre-empted. See id. at 390 (stating in dicta that some state actions may affect prices, routes, or services in a manner that is too tenuous or remote to be pre-empted). The Supreme Court has not yet applied this limiting language from Morales, but Botz relies upon a line of federal and state court decisions that have held certain state-law employment discrimination claims to be too remote or tenuously related to air-carrier prices, routes, and services to be pre-empted.[8] She asserts that her Minnesota whistleblower statute claims are employment

_____

[8]Botz cites several distinguishable cases in which courts have held that the ADA did not pre-empt claims brought by air-carrier employees pursuant to state

-12-

claims only and, like the employment discrimination cases she cites, the effect they have, if any, on air-carrier prices, routes, and services is too remote and attenuated to fall within the ambit of the ADA's pre-emption provision. While once again acknowledging that the Minnesota whistleblower statute does not regulate or even refer to air-carrier prices, routes, and services directly, we conclude that the cases Botz cites are highly distinguishable from hers. None of those cases involved a state law that granted a flight attendant or other air-carrier employee the right to refuse an assignment that is essential to a carrier's ability to provide its scheduled services. Therefore, the kind of effect that the Minnesota whistleblower statute is capable of exerting upon routes and services did not exist in those cases. Just as importantly, none of those cases involved an application of a state law that purports to regulate the same segment of the air-carrier industry as an integrated and comprehensive provision of the ADA. The fact that the WPP now provides a comprehensive scheme for protecting the precise sort of air safety-related conduct Botz engaged in here, is, as we discuss more fully infra, powerful evidence of Congress's clear and manifest intent to pre-empt state-law whistleblower claims related to air safety. Thus, in accordance with the ADA pre-emption provision's plain language and the Supreme Court's instruction that the provision's "related to" language should be broadly applied, we conclude that the Minnesota whistleblower statute has a forbidden connection with both air-carrier routes and services.

Our analysis of the ADA's pre-emptive effect is bolstered by Congress's enactment of the WPP, for the WPP's protections illustrate the types of claims Congress intended the ADA to pre-empt. Cf. Cal. Div. of Labor Standards

---

discrimination laws. See Wellons v. Northwest Airlines, Inc., 165 F.3d 493 (6th Cir. 1999) (race discrimination); Parise v. Delta Airlines, Inc., 141 F.3d 1463 (11th Cir. 1998) (age discrimination); Abdu-Brisson v. Delta Air Lines, 128 F.3d 77 (2d Cir. 1997) (same); Aloha Islandair, Inc. v. Tseu, 128 F.3d 1301 (9th Cir. 1997) (disability discrimination); Gilman v. Northwest Airlines, Inc., 583 N.W.2d 536 (Mich. Ct. App. 1998) (age and sex discrimination); Delta Air Lines v. N.Y. State Div. of Human Rights, 689 N.E.2d 898 (N.Y. 1997) (disability, age, and sex discrimination).

<u>Enforcement v. Dillingham Constr., N. A., Inc.</u>, 519 U.S. 316, 325 (1997). In fashioning a single, uniform standard for dealing with employee complaints of air-safety violations, Congress furthered its goal of ensuring that the price, availability, and efficiency of air transportation rely primarily upon market forces and competition rather than allowing them to be determined by fragmented and inconsistent state regulation. <u>See</u> 49 U.S.C. § 40101(a)(6) (1994); <u>id.</u> § 40101(a)(7) (declaring ADA's policy of fostering a sound regulatory system that responds to the public's needs and reaches decisions promptly); <u>Morales</u>, 504 U.S. at 378 (explaining that Congress added the pre-emption provision to the ADA "[t]o ensure that the States would not undo federal deregulation with regulation of their own"). By making the Secretary of Labor's findings and remedy order in response to an employee's complaint reviewable by the federal courts of appeals, Congress insured a more uniform interpretation of the WPP, and thus a more predictable response to public air-safety complaints, than would likely be possible if it had granted review in the courts of the fifty States. <u>Cf.</u> 49 U.S.C. § 40101(a)(1), (3) (expressing ADA's policy of "assigning and maintaining safety as the highest priority in air commerce"); <u>id.</u> § 40101(a)(7). The WPP's single, uniform scheme for responding to air-carrier employees' reports of air-safety violations fosters fairness far better than a patchwork, hit-or-miss system of whistleblower protections scattered throughout the States. <u>See</u> <u>id.</u> § 40101(a)(5) (expressing ADA's policy of "encouraging fair wages and working conditions"); <u>cf.</u> <u>FMC Corp. v. Holliday</u>, 498 U.S. 52, 60 (1990) (observing that "where a 'patchwork scheme of regulation would introduce considerable inefficiencies in [ERISA] benefit program operation,' we have applied the pre-emption clause to ensure that benefit plans will be governed by only a single set of regulations" (quoting <u>Fort Halifax</u>, 482 U.S. at 11)).

Botz argues that the WPP was not intended to pre-empt State whistleblower protections because, if it had been, Congress could easily have made such pre-emption express by including language in the WPP indicating that it was a whistleblowing air-carrier employee's exclusive remedy. We think this turns the proper logic on its head. When it fashioned the WPP, Congress was surely aware of

the ADA's express pre-emption provision. It was presumably aware, as well, that the Supreme Court had determined that the provision had a broad application and should be given an expansive interpretation. Given this, we would expect Congress to have directed language in the WPP to the issue of federal pre-emption only if it had been Congress's intent that the WPP not exert any pre-emptive effect upon state whistleblower provisions. For this reason, the cases Botz cites in which courts held—before Congress enacted the WPP—that the ADA did not pre-empt state whistleblower or retaliatory discharge claims have no bearing here.[9]

The WPP provides a reporting and complaint procedure and a remedy for claims like Botz's that are based on an air-carrier employee's attempts to redress a possible air-safety violation. While the plain language of the ADA's pre-emption provision encompasses Botz's claims, the WPP makes it unmistakable that such claims are pre-empted and dispels whatever doubt might possibly linger after a plain-language analysis of the ADA's pre-emption provision.

---

[9]Botz cites Espinoza v. Continental Airlines, 80 F. Supp. 2d 297 (D.N.J. 2000) (holding ADA did not pre-empt aircraft mechanic's state whistleblower claim for retaliatory discharge, allegedly for reporting possible violations of Federal Aviation Regulations), Vanacore v. UNC Ardco Inc., 697 So. 2d 892 (Fla. Dist. Ct. App. 1997), and Anderson v. Evergreen International Airlines, Inc., 886 P.2d 1068 (Or. Ct. App. 1994). But see Marlow v. AMR Servs., Corp., 870 F. Supp. 295 (D. Haw. 1994) (holding the ADA did pre-empt jetbridge mechanic's claims that he was discharged in violation of state whistleblower act and state public policy, allegedly for reporting health and safety violations). Each of these cases Botz cites relies on the fact—a fact that is no longer true—that the ADA provided no claim or remedy for air-carrier employees discharged in retaliation for their whistleblowing conduct. Such employees now enjoy protection under the WPP. Cf. Wolens, 513 U.S. at 224, 228 n.4 (stressing that the Court's conclusions in both Wolens and Morales that state legislative acts were pre-empted relied in part upon the fact that a federal agency retained authority to investigate and enjoin the very conduct that the state acts had sought to regulate). Accordingly, we find the analyses of the ADA's pre-emptive effect in these cases to be unpersuasive.

IV.

Because Botz's Minnesota whistleblower statute claims have a prohibited connection with air-carrier routes and services, and are therefore pre-empted by the ADA, we affirm the District Court's dismissal of Botz's claims.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.