**Thomas A. REGNER, Appellant,**

v.

**NORTHWEST AIRLINES, INC., Respondent.**

No. C4–02–463.

Court of Appeals of Minnesota.

Nov. 5, 2002.

Susan M. Coler, Sprenger & Lang, PLLC, Minneapolis, MN, for appellant.

Timothy R. Thornton, Scott G. Knudson, Susan E. Ryan, Briggs and Morgan, P.A., Minneapolis, MN, for respondent.

Considered and decided by G. BARRY ANDERSON, Presiding Judge, PETERSON, Judge, and HUDSON, Judge.

## OPINION

PETERSON, Judge.

Appellant Thomas A. Regner, an airline mechanic employed by respondent Northwest Airlines, Inc., was fired after he filed reports of alleged safety violations with the Federal Aviation Administration. Regner sued under the Whistleblower Act, Minn.Stat. § 181.932, subd. 1(a), contending that he was fired for making the reports. In this appeal from a summary judgment for Northwest, Regner challenges the district court's conclusion that under the Airline Deregulation Act, 49 U.S.C. § 41713, Congress intended to preempt state whistleblower claims when an employee reports a violation or suspected violation of a Federal Aviation Administration safety regulation. We affirm.

## FACTS

Northwest hired Regner as an aircraft mechanic in August 1989 and promoted him to the position of crew chief in 1996. As a crew chief, Regner was responsible for assigning maintenance and repair work to crew members and making sure that the maintenance and repair work and required paperwork were properly completed.

Under federal safety regulations, an aircraft used to carry passengers must have an airworthiness certificate in effect. 49 U.S.C. § 44711(a)(1). When a nonroutine repair was required on a Northwest aircraft, a mechanic or crew chief wrote up a card stating what work was required. Before the aircraft could be returned to service, the repair either had to be completed or, if the repair was not related to airworthiness, it could be deferred. Completion or deferral of a repair was indicated on the card.

Federal aviation regulations also require aircraft mechanics to report safety violations to the Federal Aviation Administration. On five occasions between March and April 1998, Regner reported possible safety violations by Northwest to the Federal Aviation Administration. A factual dispute exists regarding whether Regner made the reports in good faith or as part of an orchestrated work slowdown. Northwest discharged Regner from employment on May 5, 1998, and Regner brought this action claiming that he was fired for reporting the safety violations. The district court concluded that Regner's claim is preempted by the Airline Deregulation Act (ADA) and granted summary judgment for Northwest.

## ISSUE

Is Regner's whistleblower claim brought under Minn.Stat. § 181.932, subd. 1(a) preempted by the ADA?

## ANALYSIS

"Whether a claim is preempted is a question of congressional intent that is 'at bottom' a legal question of statutory construction." *Leonard v. Northwest Airlines, Inc.*, 605 N.W.2d 425, 428 (Minn. App.2000). Statutory construction is subject to de novo review. *Metropolitan Sports Facilities Comm'n v. County of Hennepin*, 561 N.W.2d 513, 515 (Minn. 1997).

> Preemption analysis begins with the assumption that the "historic police powers of the [s]tates" are not to be eclipsed unless to do so was "the clear and manifest purpose of Congress."

*Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918, 922 (Minn.1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). When determining the preemptive effect of the ADA,

> our ultimate touchstone is the purpose of Congress. We begin with the language employed by Congress and the

assumption that the ordinary meaning of that language accurately expresses the legislative purpose. We do not lightly infer pre-emption in the area of employment law, for it falls within the traditional police power of the State.

*Botz v. Omni Air Int'l,* 286 F.3d 488, 492–93 (8th Cir.2002) (quotations and citations omitted).

The FAA [Federal Aviation Act] was passed by Congress for the purpose of centralizing in a single authority the power to frame rules for the safe and efficient use of the nation's airspace. To that end, Congress set out a legal duty, enforceable by the Secretary of Transportation, that interstate air carriers perform their services "with the highest possible degree of safety * * *."

*Botz v. Omni Air Int'l,* 134 F.Supp.2d 1042, 1047 (D.Minn.2001) (quoting 49 U.S.C. § 44701(d)(1)(A)) (other quotation omitted), *aff'd,* 286 F.3d 488 (8th Cir.2002). The FAA was amended by the ADA in 1978, 49 U.S.C. 41713 (1995).

The enactment [of the ADA] was motivated by congressional belief that maximum reliance on competitive market forces would best further efficiency, innovation, and low prices as well as variety and quality of air transportation services.

*Leonard,* 605 N.W.2d at 429 (quotation omitted).

The ADA contains the following preemption provision:

[A] State * * * may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier * * *.

49 U.S.C. § 41713(b)(1); *see Leonard,* 605 N.W.2d at 429 (purpose of preemption provision is to prevent states from undoing deregulation).

The United States Supreme Court has set forth a two-part test for determining whether the ADA preempts a state claim. *Leonard,* 605 N.W.2d at 429 (citing *American Airlines v. Wolens,* 513 U.S. 219, 226, 115 S.Ct. 817, 823, 130 L.Ed.2d 715 (1995); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992)). "To be preempted, the claim must (1) relate to prices, routes, or services, and (2) constitute an enactment or enforcement of state law." *Id.* (citing *Wolens,* 513 U.S. at 226, 115 S.Ct. at 823). Because this lawsuit arises under the Whistleblower Act, the second prong is satisfied. *See id.* at 431 (distinguishing between contract claims that seek simply to enforce the bargain of the parties and those that require the enforcement of state law or policy outside the contract). Thus, the question is whether this lawsuit relates to prices, routes, or services.

The Minnesota Whistleblower Act states:

An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(a) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

(b) the employee is requested by a public body or office to participate in an investigation, hearing, inquiry;

(c) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursu-

ant to law, and the employee informs the employer that the order is being refused for that reason; or

(d) the employee, in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm.

Minn.Stat. § 181.932, subd. 1 (Supp.1997).

In *Botz*, the federal district court summarized the Supreme Court's decisions in *Wolens* and *Morales* as follows:

The [Morales] Court stated that the ordinary meaning of the phrase "related to" is broadly defined as "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." The question before the Court in *Morales* was whether the enforcement of state law, prohibiting deceptive advertising by airlines, was "related to" airline rates, and within the preemptive scope of § 41713(b)(1). The Court found that the state law was sufficiently related to airline's rates to fall within the scope of the FAA's preemption, reasoning that restrictions on the advertising of airline rates would serve to increase the difficulty of discovering the lowest cost seller and reduce the incentive to price competitively. The Supreme Court, therefore, applied a very broad reading of the term "related to."

The Supreme Court also addressed the breadth of the FAA's preemption in [*Wolens* ]. In *Wolens*, the Court held that the FAA preempted the plaintiff's state Consumer Fraud Act claims, but did not preempt plaintiff's common-law contract claims. With respect to the plaintiff's Consumer Fraud Act claims,

the Court relied on its holding in *Morales* to find that the Act was preempted. The Court reasoned that applying the Act to airlines amounted to a policing of the marketing practices of the airlines. Accordingly, the Court held that the Act was related to the airline's services. The Court declined, however, to apply FAA preemption to plaintiff's breach of contract claim because the claim did not arise from a state-imposed obligation, as required for FAA preemption. Under *Morales* and *Wolens*, the term "related to a service" and the scope of FAA preemption are to be interpreted broadly by this Court.

*Botz*, 134 F.Supp.2d at 1045–46.

In *Botz*, the Eighth Circuit Court of Appeals, based on the plain language of the ADA's preemption provision and on *Morales* and *Wolens*, held that the ADA preempted a flight attendant's claim under the Minnesota Whistleblower Act. *Botz v. Omni Air Intern.*, 286 F.3d 488, 498 (8th Cir.2002). The flight attendant was terminated after she refused to accept an assignment that she believed violated regulations governing the maximum hours a flight attendant can fly in a specified time period. *Botz*, 286 F.3d at 490. The Eighth Circuit court explained:

When applied to the facts surrounding Botz's discharge, the Minnesota whistleblower statute has a forbidden connection with air-carrier services. It includes broad authorization to flight attendants to refuse assignments, jeopardizing an air carrier's ability to complete its scheduled flights. The FAR [Federal Aviation Regulations] set standards for the minimum number of flight attendants that must be on board and available to serve passengers and execute safety procedures. Thus, an air carrier is unauthorized to fly or even board passengers if an aircraft's crew

does not include the proper number of flight attendants. An air carrier that is confronted with a flight attendant's refusal to serve on a flight to which he has been assigned has at least two obvious options for dealing with the scheduled flight. It can replace the refusing flight attendant with another flight attendant it employs, or, if it is unable to replace him in time, it can cancel the flight to comply with the FAR prescriptions of the minimum number of flight attendants and reschedule the ticketed passengers onto other flights.

\* \* \* [A] significant likelihood exists that the carrier will have to cancel the flight in order to comply with the FAR's flight-attendant staffing regulations. \* \* \* An air carrier cannot avoid this possibility even by adhering to every law, rule, and regulation—federal and state, for the Minnesota whistleblower statute authorizes refusals based on the flight attendant's objective, fact-based belief alone that the assignment is violative. This authorization to refuse assignments, and the protections that the whistleblower statute provides, have a forbidden connection with an air carrier's service under any reasonable interpretation of Congress's use of the word "service."

*Id.* at 494–95; *see also Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 (5th Cir. 1995) (holding that "services" refers to elements of "the contractual arrangement between the airline and the user of the service," including "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself").

Regner argues that this case is distinguishable from *Botz* because he brought his claim under Minn.Stat. § 181.932, subd. 1(a), not Minn.Stat. § 181.932, subd. 1(c). But the *Botz* plaintiff sued under both subsections (a) and (c). *Id.* at 490. In any event, Regner's argument that a distinction should be made between subsections (a) and (c) for the purpose of preemption is not persuasive. We conclude that just as a flight attendant can interrupt services by refusing an assignment, an aircraft mechanic can interrupt services by grounding an aircraft based on an alleged mechanical violation.

We recognize that the ADA was amended after Regner initiated this lawsuit and before the *Botz* plaintiff initiated hers. In 2000, Congress amended the ADA by adding a section establishing a comprehensive scheme for aggrieved employees to bring whistleblower claims. *Botz,* 134 F.Supp.2d at 1048. Before the enactment of the ADA's whistleblower provision, there was a split among authorities, with some jurisdictions holding that the ADA did not preempt state retaliatory-discharge claims and others holding that it did. *See, e.g., Espinosa v. Continental Airlines,* 80 F.Supp.2d 297 (D.N.J.2000) (holding that FAA did not completely preempt state retaliation claim); *Marlow v. AMR Serv. Corp.,* 870 F.Supp. 295 (D.Haw.1994) (holding that state whistleblower claim was preempted by the FAA).

The Eighth Circuit's decision in *Botz,* however, was based strictly on the ADA preemption provision's plain language and the Supreme Court's construction of the term "related to". The Eighth Circuit stated:

[I]n accordance with the ADA pre-emption provision's plain language and the Supreme Court's instruction that the provision's "related to" language should be broadly applied, we conclude that the Minnesota whistleblower statute has a forbidden connection with both air-carrier routes and services.

*Botz,* 286 F.3d at 496–97. Only after stating its holding did the court note that its

decision was bolstered by the addition of the whistleblower provision to the ADA. *Id.* at 497.

Regner cites the FAA's savings clause as support for his argument against preemption. The savings clause states, "[a] remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. 40120(c) (1994). Regner argues that this provision "confirms that Congress contemplated the survival of state law remedies that did not interfere with the ADA's purpose." But "[t]he Supreme Court has referred to this as a general 'remedies' savings clause and deemed it "a relic of the pre-ADA/no pre-emption regime.'" *Botz,* 286 F.3d at 491 (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 385, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)).

■ While this court is not bound to follow Eighth Circuit precedent, it is persuasive authority. *Northpointe Plaza v. City of Rochester,* 457 N.W.2d 398, 403 (Minn.App.1990), *aff'd,* 465 N.W.2d 686 (Minn.1991). Because we are persuaded by the Eighth–Circuit's well-reasoned decision in *Botz,* we hold that the ADA preempts Regner's whistleblower claim.

Having concluded that the ADA preempts Regner's whistleblower claim, we do not reach Northwest's argument that Regner's claim is preempted by the Railway Labor Act.

## DECISION
Because Regner's whistleblower claim brought under Minn.Stat. § 181.932, subd. 1(a), relates to a price, route, or service of an air carrier and constitutes enforcement of a state law, the claim is preempted by 49 U.S.C. § 41713(b)(1).

**Affirmed.**

G. BARRY ANDERSON, Judge concurring specially.

G. BARRY ANDERSON, Judge (concurring specially).

I concur with the majority and agree with the conclusion that appellant's state whistleblower claim is preempted by the federal Airline Deregulation Act. I write separately, however, to express my concerns with respondent's use of the record and *ad hominem* arguments.

Respondent's brief is replete with extreme factual assertions relating to appellant's alleged participation in a mechanics' work slowdown. For example, respondent alleges that, prior to appellant's termination from employment, appellant "attempted to shield himself from slowdown accountability by reporting alleged maintenance irregularities to the airline and the FAA." Respondent also alleges that although appellant's conduct "did not result in flight cancellation, the purpose of [appellant's] conduct—the disruption of air carrier service—is beyond cavil." Finally, respondent alleges that appellant "was attempting to put half of the aircraft that [respondent] operated on the ground. [Appellant] arrogated on to himself command over a fleet of 180 aircraft. He would say when those DC–9s would fly."

While appellant's participation in the alleged "slowdown" can arguably be inferred from the circumstances, respondent fails to cite to any part of the record supporting these specific allegations. Parties before this court have an obligation under the rules of civil appellate procedure to cite to the specific part of the record that supports each factual assertion. Minn. R. Civ. App. 128.03

Although respondent argues otherwise, the record indicates that the FAA and respondent took some action to ameliorate certain "unairworthy" conditions identified by appellant as posing safety risks to re-

spondent's aircraft. For instance, the FAA responded to appellant's complaint about the use of certain fire-containment tape by issuing a "technical alert," and, in response to appellant's complaint concerning the charging of emergency-light battery packs, respondent amended its Boeing 727 maintenance manual and revised a chapter of its general engineering and maintenance manual. Because respondent took these steps, the FAA did not take further enforcement action "pursuant to [respondent's] commitment to the proposed actions." These corrective actions may have been relatively minor, but there seems to be no dispute that they were in response to appellant's complaints.

I turn next to respondent's *ad hominem* and irrelevant arguments against appellant and appellant's counsel. Respondent claims, among other things, that "maintenance disruption is a time-honored collective bargaining stratagem among [respondent's] unionized mechanics." Further,

respondent states that appellant "apparently has difficulty understanding appellate court opinions." Both arguments are examples of non-sequiturs—fallacies of irrelevance.[1] The circumstances surrounding appellant's complaints are not relevant to the issues in this case and respondent's use of appellant's union membership, and union conduct in general, to impugn appellant's legal argument is simply wrong.

There is little doubt that respondent was benefited here by competent, effective and aggressive advocacy. Although not directly related to the disposition of this case, because I have concerns with the form and expression of that advocacy, I concur specially.

---

1. The *personal attack*, or argument *ad hominem* (Latin for "against the person"), attempts to undercut a claim by drawing unfavorable attention to the person making it. * * * An opponent's thesis is asserted to be wrong or unworthy of attention because of the opponent's character or situation. Such reasoning is fallacious because it does not address the truth or falsity of the proposition itself.
Robert Paul Churchill, *Logic: An Introduction* 465 (2d ed.1990).
It is of course a matter of historical record and beyond dispute that labor unions have engaged in "slowdown" tactics or have engaged in other conduct determined to be wrongful. *United Air Lines, Inc. v. Int'l Assoc. of Machinists and Aerospace Workers,* 243 F.3d 349, (7th Cir.2001) (stating that the issu-

ance of an injunction in favor of the airline was appropriate based on proof that *IAM* participated in, authorized, or ratified work slowdowns by some of its union members). And it is equally a matter of historical record and beyond dispute that employers have engaged in tactics or conduct determined to be wrongful. *Advanced Constr. Services, Inc. v. N.L.R.B.,* 247 F.3d 807 (8th Cir.2001) (holding that an employer was found to have violated its duty to bargain lawfully by refusing to provide information to the local union affiliate).
But it is not necessary to resolve whether management or labor is on the side of the angels. As interesting as that philosophical question is, it is irrelevant to the only question at hand here—does preemption apply?