# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-1900

_____

John A. Watson, V,

*Plaintiff - Appellant*,

v.

Air Methods Corporation,

*Defendant - Appellee*.

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 14, 2016
Filed: August 24, 2016
[Published]

_____

Before WOLLMAN, MELLOY, and COLLOTON, Circuit Judges.

_____

PER CURIAM.

John Watson sued his former employer, Air Methods Corporation, in Missouri state court for wrongful discharge in violation of public policy. Air Methods removed the case to federal court and then moved to dismiss based on the pre-emption provision of the Airline Deregulation Act ("ADA"), 49 U.S.C.

§ 41713(b)(1).  The district court,[1] relying on our decision in *Botz v. Omni Air International*, 286 F.3d 488 (8th Cir. 2002), dismissed the complaint, and Watson appeals.  Although three circuits have disagreed with *Botz* in relevant part, we agree with the district court that circuit precedent requires the dismissal of Watson's complaint.

Air Methods operates flights and provides in-flight medical care for patients who require emergency air transportation to hospitals.  The company maintains a fleet of 450 aircraft and qualifies as an "air carrier" for purposes of federal aviation regulations.  49 U.S.C. § 40102(a)(2).

From July 2013 until May 2014, Watson worked as a flight paramedic for Air Methods.  Watson claims that during his employment with Air Methods, he observed numerous violations of federal airline safety regulations.  These included a pilot making a cell-phone videos during flight, members of a medical crew text messaging during critical phases of flight, a pilot attempting to take off in unsafe conditions, and another pilot making unnecessary "run-on landings."  Watson reported these alleged violations to Air Methods' corporate office.  He asserts that the company responded by suspending him and later terminating his employment.

In August 2014, Watson sued Air Methods in Missouri state court for the common-law tort of wrongful discharge in violation of public policy. Under Missouri common law, an employer may not terminate an employee "(1) for refusing to violate the law or any well-established and clear mandate of public policy . . . or (2) for reporting wrongdoing or violations of law to superiors or public authorities." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. 2010).  Air Methods removed the case to federal court, invoking diversity jurisdiction under 28 U.S.C.

---

[1]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

§ 1332, and then moved to dismiss the complaint based on *Botz*. The district court granted the motion, concluding that the ADA, as interpreted in *Botz*, pre-empts Watson's wrongful discharge claim. Whether Watson's claim is pre-empted by the ADA is a question of law that we review *de novo*. *Kutten v. Bank of Am., N.A.*, 530 F.3d 669, 670 (8th Cir. 2008).

In 1978, Congress passed the ADA "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services." Pub. L. No. 95-504, 92 Stat. 1705, 1705 (1978). Prior to the ADA, the Civil Aeronautics Board possessed broad power to regulate the interstate airline industry, including the authority to prescribe routes and fares. Federal Aviation Act of 1958, Pub. L. No. 85-726, tit. IV, 72 Stat. 731, 754-71 (1958). The ADA largely deregulated domestic air transportation and provided for the eventual termination of the Civil Aeronautics Board. 92 Stat. at 1744-54.

"To ensure that the States would not undo federal deregulation with regulation of their own," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378-79 (1992), the ADA contains an express pre-emption clause, providing in relevant part:

> [A] State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of an air carrier* that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1) (emphasis added). This section has a "broad pre-emptive purpose," precluding state laws "having a connection with or reference to airline 'rates, routes, or services.'" *Morales*, 504 U.S. at 383-84. The ADA pre-empts both state laws "specifically addressed to the airline industry" and generally applicable laws that indirectly relate to air carriers' rates, routes, or services. *Id.* at 386.

In *Botz*, we construed the effect of the ADA pre-emption clause on state whistleblower-protection laws. There, a flight attendant refused to work both legs of an Alaska-to-Japan round trip because she believed the assignment violated a federal regulation concerning cabin crewmembers' working hours. *Botz*, 286 F.3d at 490 (citing 14 C.F.R. § 121.467 (2001)). She also reported to the airline her belief that the refused assignment, and a comparable assignment six months earlier, violated the regulation. *Id.* The airline fired the flight attendant for insubordination and refusing to accept an assignment, and she sued under the Minnesota whistleblower-protection statute. *Id.* at 490-91. The Minnesota statute prohibited an employer from firing an employee who reports in good faith a suspected violation of federal or state law or "refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law." Minn. Stat. § 181.932, subds. 1(1), (3).

In concluding that the Minnesota statute "related to . . . service of an air carrier" within the meaning of § 41713(b)(1), this court focused first on the potentially disruptive effect of even a single crewmember refusing a work assignment. *Botz*, 286 F.3d at 494-95. Federal airline regulations set minimum staffing requirements for all commercial flights, so a crewmember's refusal to fly usually will force an airline either to find a last-minute replacement or to cancel the flight. *Id.* at 494. We observed that:

> [r]eplacing a flight attendant even with a few days notice might prove problematic or even impossible . . . for a small air carrier with relatively few flight attendants. For any size carrier, a significant likelihood exists that the carrier will have to cancel the flight in order to comply with the [federal] flight-attendant staffing regulations.

*Id.* at 494-95. Therefore, the court concluded that the "authorization to refuse assignments, and the protection that the whistleblower statute provides, have a

forbidden connection with an air carrier's service under any reasonable interpretation of Congress's use of the word 'service.'" *Id.* at 495.

The *Botz* panel then explained that its analysis of the ADA's pre-emptive effect was "bolstered by" the Whistleblower Protection Program of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("WPP"), 49 U.S.C. § 42121. *Botz*, 286 F.3d at 497. Enacted in 2000, the WPP amended the ADA to create what this court described as a "single, uniform scheme for responding to air-carrier employees' reports of air-safety violations." *Id.* The *Botz* court thought the WPP's protections "illustrate the types of claims Congress intended the ADA to pre-empt." *Id.*

Although the WPP does not contain a pre-emption provision, *Botz* concluded that the enactment informed the scope of pre-emption under the ADA. The court reasoned that Congress, presumably aware of the broad pre-emptive scope of § 41713(b)(1), would have "directed language in the WPP to the issue of federal pre-emption only if it had been Congress's intent that the WPP *not* exert any pre-emptive effect upon state whistleblower provisions." *Id.* "In fashioning a single, uniform standard for dealing with employee complaints of air-safety violations," the court said, "Congress furthered its goal of ensuring that the price, availability, and efficiency of air transportation rely primarily upon market forces and competition rather than allowing them to be determined by fragmented and inconsistent state regulation." *Id.* The court thus concluded that the WPP was "powerful evidence of Congress's clear and manifest intent to pre-empt state-law whistleblower claims related to air safety." *Id.* at 496. In the end, *Botz* determined that the plain language of the ADA's pre-emption provision encompassed the plaintiff's claims, but that the WPP dispelled "whatever doubt might possibly linger after a plain-language analysis of the ADA's pre-emption provision." *Id.* at 498.

Three circuits have declined to follow *Botz* in situations where an employee asserted only that he was fired for making a *post hoc* safety report. In *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248 (11th Cir. 2003), the Eleventh Circuit concluded:

> [W]e do not dispute the Eighth Circuit's conclusion that the grounding of an airplane is related to airline services . . . . [W]e are not concerned with the withdrawal of clearance for a plane to take off based on mechanical concerns, but instead only with Branche's *post hoc* reporting of a [safety] violation. The likely consequence . . . is an investigation by FAA officials . . . , but not the grounding of the plane.

*Id.* at 1262-63. Similarly, in *Gary v. Air Group, Inc.*, 397 F.3d 183 (3d Cir. 2005), the Third Circuit found much of *Botz* inapposite because, "[u]nlike Botz, Gary never refused a work assignment, and thus his report to The Air Group . . . did not have the potential to interrupt service by grounding a particular flight." *Id.* at 189. Most recently, in *Ventress v. Japan Airlines*, 603 F.3d 676 (9th Cir. 2010), the Ninth Circuit agreed with the treatment of *Botz* adopted by *Branche* and *Gary*. The court reasoned that a report of "safety violations six months after they occurred and after completion of the scheduled flights" did not relate to the air carrier's service, because the report did not "ground[] or ha[ve] the potential to ground a flight." *Id.* at 683.

These courts also disagreed with *Botz*'s analysis of the WPP. Observing that pre-emption should not lightly be inferred, they concluded that the WPP and its silence on the issue of pre-emption did not alter the pre-emptive scope of the ADA in any meaningful way. *Ventress*, 603 F.3d at 683; *Gary*, 397 F.3d at 190; *Branche*, 342 F.3d at 1261-63. The other circuits believed that "*Botz* went too far in expanding ADA preemption." *Gary*, 397 F.3d at 190; *accord Ventress*, 603 F.3d at 683.

Watson argues that we should distinguish *Botz* on a ground suggested by these other circuits: Watson did not refuse a work assignment that could have affected the

carrier's service; he simply made a *post hoc* safety report that had no potential to interfere with a flight. We have considered this contention carefully, but we are constrained by circuit precedent to rule that Watson's claim is pre-empted. The plaintiff in *Botz* brought two whistleblower-retaliation claims: one based on refusing to accept an assignment and one based on reporting a perceived violation of federal safety regulations. 286 F.3d at 489, 490-91, 491-92. This court affirmed the dismissal of both claims. *Id.* at 498. Watson's proffered distinction could explain dismissal of the former claim but not the latter. Because *Botz* ruled that the plain language of § 41713(b)(1), bolstered by enactment of the WPP, pre-empted a whistleblower-retaliation claim based on reporting an alleged safety violation to an employer, we conclude that Watson's claim cannot be distinguished from the second claim dismissed in *Botz*.

Watson argues that if *Botz* cannot be distinguished, then it should be overruled in relevant part. But one three-judge panel cannot overrule another. Watson may raise this contention in a petition for rehearing en banc.

For these reasons, the judgment of the district court is affirmed.

_____