[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 21, 2003
THOMAS K. KAHN
CLERK

No. 02-14920

D. C. Docket No. 01-01747-CV-8-T-30M

MICHAEL F. BRANCHE,

Plaintiff-Appellant,

versus

AIRTRAN AIRWAYS, INC.,
a foreign corporation,

Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of Florida

(August 21, 2003)

Before MARCUS and WILSON, Circuit Judges, and RESTANI[*], Judge.

MARCUS, Circuit Judge:

---

[*]Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

This case ultimately requires us to determine whether a claim brought by appellant Michael Branche ("Branche") against his former employer, Airtran Airways, Inc. ("Airtran"), pursuant to Florida's Whistleblower Act, Fla. Stat. § 448.102, is expressly pre-empted by the federal Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713. This question forces us, in turn, to decide whether Branche's claim significantly affects "air carrier services," as that phrase is used in the ADA's pre-emption clause. This is a close question that is rendered especially difficult by Congress's 1999 amendment of the ADA to include the Whistleblower Protection Program ("WPP"), 49 U.S.C. § 42121, a provision that offers a remedy for plaintiffs in Branche's position that parallels the one available under Florida law. After thoroughly considering the arguments raised by the parties and the applicable caselaw, we conclude that Branche's claim is not pre-empted. Because the district court held contrarily, we vacate its entry of final summary judgment in favor of Airtran and remand this case for further proceedings consistent with this opinion.

**I**

The basic facts are these. Branche was first hired by Airtran on September 2, 1998 as a maintenance controller, and he subsequently was transferred to the

2

position of aircraft inspector at Tampa International Airport ("TIA"). In fact, Branche was appellee's only aircraft inspector at TIA. In this capacity, appellant was required to conduct safety inspections on Airtran's aircraft after they had been serviced by appellee's maintenance crew but prior to takeoff. These inspections were governed by FAA regulations, including 14 C.F.R. § 121.365(c),[1] which provides that this inspection function is to be exercised free from the oversight of the maintenance department whose work the inspector reviews. Branche says that during June, 2001, Guy Lewis, Airtran's maintenance manager at TIA, began exercising supervisory authority over him in direct contravention of § 121.365(c).

Branche alleges that on June 30, 2001, an Airtran DC-9 airplane landed at TIA with one of its two engines running at a temperature that exceeded Federal Aviation Administration ("FAA") safety guidelines, a condition that could have resulted in engine failure. After perceiving this dangerous condition, Branche

---

[1]This subsection provides:

> Each person performing required inspections in addition to other maintenance, preventive maintenance, or alterations, shall organize the performance of those functions so as to separate the required inspection functions from the other maintenance, preventive maintenance, and alteration functions. The separation shall be below the level of administrative control at which overall responsibility for the required inspection functions and other maintenance, preventive maintenance, and alteration functions are exercised.

14 C.F.R. § 121.365(c).

recommended to Lewis that the engine be subjected to a detailed physical

inspection. Instead, Lewis and two maintenance workers climbed into the

aircraft's cockpit and conducted a "high powered run," i.e., began running the

engine at high power in an effort to ascertain its air-worthiness. Appellant alleges

that none of these individuals were qualified to undertake this diagnostic

maneuver, and that as such they violated 14 C.F.R. § 65.81[2] in performing it. He

further asserts that Paul Picarelli, an employee who was authorized to perform

---

[2]This section provides:

> a) A certificated mechanic may perform or supervise the maintenance, preventive maintenance or alteration of an aircraft or appliance, or a part thereof, for which he is rated (but excluding major repairs to, and major alterations of, propellers, and any repair to, or alteration of, instruments), and may perform additional duties in accordance with §§ 65.85, 65.87, and 65.95. However, he may not supervise the maintenance, preventive maintenance, or alteration of, or approve and return to service, any aircraft or appliance, or part thereof, for which he is rated unless he has satisfactorily performed the work concerned at an earlier date. If he has not so performed that work at an earlier date, he may show his ability to do it by performing it to the satisfaction of the Administrator or under the direct supervision of a certificated and appropriately rated mechanic, or a certificated repairman, who has had previous experience in the specific operation concerned.
>
> (b) A certificated mechanic may not exercise the privileges of his certificate and rating unless he understands the current instructions of the manufacturer, and the maintenance manuals, for the specific operation concerned.

14 C.F.R. § 65.81.

high powered runs, was present at TIA at the time, and that under § 65.81 Picarelli should have been asked to test the engine in question. Branche says that after the plane in question departed from TIA on June 30, 2001, the engine overheated during its flight to Atlanta and the plane subsequently was taken out of service. Moreover, he alleges that the following day he investigated this particular engine and learned that it had overheated on two separate occasions during the preceding two weeks.

On July 2, 2001, Branche informed the FAA of Airtran's regulatory violations, and both he and Airtran subsequently were contacted regarding his allegations. Airtran soon became aware that Branche was the source of the FAA's knowledge of the incidents in question. On July 6, 2001, appellant filed a formal union grievance in which he asserted that neither Lewis nor the mechanics who accompanied him in the cockpit were authorized to perform a high power engine run. Then, on July 13, 2001, Airtran accused him of falsifying his time card and stealing approximately two hours of pay. Appellant denied the allegation. On July 23, 2001, Branche was terminated based on this alleged time card violation. Appellant posits that the true reason for his discharge was retaliatory, i.e., to punish him for reporting Airtran's violations of FAA regulations.

5

Based on this pattern of dealing, on August 27, 2001 Branche filed this action in the Circuit Court for the Sixth Judicial Circuit, in Pinellas County, Florida. He advanced a single claim under Florida's Whistleblower Act, Fla. Stat. § 448.102. Airtran promptly removed the case on the basis of diversity to the United States District Court for the Middle District of Florida, where discovery proceeded. On June 24, 2002, Airtran moved for final summary judgment denying appellant's claim, arguing that as applied in this case the state Whistleblower Act was explicitly pre-empted by the ADA, 49 U.S.C. § 41713. The district court agreed, and granted Airtran's motion on August 27, 2002. This appeal ensued.

On appeal, Branche argues that the district court erred by holding that the ADA pre-empts Florida's Whistleblower Act, as applied in this case. He says that pre-emption under the ADA exists only where the state law in question purports to regulate airline prices, routes or services. In this case, he argues, the relationship between Florida's prohibition against retaliatory discharges and these facets of air carrier operations is too attenuated to give rise to ADA pre-emption. Airtran responds that the scope of the ADA's express pre-emption provision is extremely broad, and that the connection between the type of conduct prohibited by the Whistleblower Act and air carrier "services" is sufficient to implicate the ADA's pre-emption clause. Moreover, appellee contends, Congress's enactment in 1999

6

of the WPP, 49 U.S.C. § 42121, supports a finding of pre-emption here, as the WPP provides an exclusive remedy for plaintiffs in Branche's position.

## II

We review a summary judgment ruling <u>de novo</u>, applying the same legal standard used by the district court. <u>See</u> <u>Johnson v. Bd. of Regents</u>, 263 F.3d 1234, 1242-43 (11th Cir. 2001). In conducting this examination, we view the materials presented and all factual inferences in the light most favorable to the non-moving party. <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed.2d 142 (1970). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of demonstrating the satisfaction of this standard lies with the movant, who must present "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" that establish the absence of any genuine, material factual dispute. <u>Id</u>.

As the Supreme Court observed in <u>Morales v. Trans World Airlines, Inc.</u>, "'[p]re-emption may be either express or implied, and is compelled whether Congress's command is explicitly stated in the statute's language or implicitly

contained in its structure and purpose.'" 504 U.S. 374, 383, 112 S. Ct. 2031, 2036, 119 L. Ed. 2d 157 (1992) (quoting FMC Corp. v. Holliday, 498 U.S. 52, 56-57, 111 S. Ct. 403, 407, 112 L. Ed. 2d 356 (1990)). In cases where Congress has chosen to explicitly address the issue of pre-emption, however, it generally is inappropriate to look beyond that provision to imply pre-emption from the statute's substantive dictates. As the Supreme Court has stated:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. Such reasoning is a variant of the familiar principle of expression unius est exclusio alterius: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.

Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517, 112 S. Ct. 2608, 2618, 120 L. Ed. 2d 407 (1992) (quoting Malone v. White Motor Corp., 435 U.S. 497, 505, 98 S. Ct. 1185, 1190, 55 L. Ed. 2d 443 (1978) and California Fed. Sav. & Loan Ass'n. v. Guerra, 479 U.S. 272, 282, 107 S. Ct. 683, 690, 93 L. Ed. 2d 613 (1987) (opinion of Marshall, J.)). Although the Supreme Court subsequently clarified that Cipollone does not establish an iron-clad rule against finding implied pre-emption under a statute containing an express pre-emption clause, see Freightliner Corp. v. Myrick, 514 U.S. 280, 287-89, 115 S. Ct. 1483, 1487-88, 131 L. Ed. 2d

8

385 (1995), it recognized that "Cipollone supports an inference that an express pre-emption clause forecloses implied pre-emption." Id. at 289, 115 S. Ct. at 1488. In other words, where a legislative enactment contains an express pre-emption provision, we typically do not consider the issue of implied pre-emption; our primary task is only to determine whether the state law in question falls within the scope of the statute expressly promulgated by Congress. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541, 121 S. Ct. 2404, 2414, 150 L. Ed. 2d 532 (2001) ("[O]ur task is to identify the domain expressly pre-empted . . . .").

Under the ADA, "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1) (emphasis added). This pre-emption clause serves the ADA's broader goal of "promot[ing] maximum reliance on competitive market forces" as opposed to state regulation in shaping the contours of the airline industry. American Airlines, Inc. v. Wolens, 513 U.S. 219, 230, 115 S. Ct. 817, 824, 130 L. Ed. 2d 715 (1995) (citation and internal punctuation omitted). Accordingly, the key question in this case is whether Branche's claim for retaliatory discharge under

9

Florida's Whistleblower Statute, Fla. Stat. § 448.102(1),[3] is "related to" the "service of an air carrier."[4]  To answer this basic question we must define the terms "related to" and "service," as used in § 41713.

In undertaking this inquiry, we are mindful that the question of whether a federal statute expressly pre-empts a state law is one that turns on "statutory intent, and we accordingly 'begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'"  Morales, 504 U.S. at 383, 112 S. Ct. at 2036 (quoting Holliday, 498 U.S. at 57, 111 S. Ct. at 407); see also Parise v. Delta Airlines, Inc., 141 F.3d 1463, 1465 (11th Cir. 1998) ("Whether a federal statute pre-empts state law is a question of congressional intent." (citing Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252, 114 S. Ct. 2239, 2243, 129 L. Ed. 2d 203 (1994)).

In Morales, the Supreme Court defined the phrase "related to," as used in the ADA's pre-emption provision.[5]  It said:

---

[3]In pertinent part, this section of Florida law prohibits private employers from "tak[ing] any retaliatory personnel action against an employee because the employee has . . . [d]isclosed . . . to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation."  Fla. Stat. § 448.102(1).

[4]No party argues that appellant's claim is "related to" the "price" or "route" of an air carrier.

[5]At the time of the Morales decision, this provision was codified at 49 U.S.C. § 1305(a)(1), but its language was functionally identical to that contained in its modern incarnation,

> For purposes of the present case, the key phrase, obviously, is "relating to." The ordinary meaning of these words is a broad one -- "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with," -- and the words thus express a broad pre-emptive purpose.

504 U.S. at 383, 112 S. Ct. at 2037 (quoting Black's Law Dictionary 1158 (5th ed. 1979)). The Court then analogized the scope of § 41713 to that of ERISA's similarly worded pre-emption provision, which says that state laws are pre-empted "insofar as they . . . relate to any employee benefit plan . . . ." 29 U.S.C. 1144(a) (emphasis added). It noted that it previously had construed ERISA's language to mean that a state law is pre-empted -- that is, "relates to" an employee benefit plan -- "'if it has a connection with or reference to such a plan.'" Morales, 504 U.S. at 384, 112 S. Ct. at 2037 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97, 103 S. Ct. 2890, 2900, 77 L. Ed. 2d 490 (1983)). The Court then held:

> Since the relevant language of the ADA is identical, we think it appropriate to adopt the same standard here: State enforcement actions having a connection with or reference to airline "rates, routes, or services" are pre-empted under 49 U.S.C.[] § 1305(a)(1).

---

§ 41713. See Morales, 504 U.S. at 383, 112 S. Ct. at 2036-37 ("Section 1305(a)(1) expressly pre-empts the States from 'enact[ing] or enforc[ing] any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier . . . .'") (emphasis added).

11

Id. Thus, so long as the state law action has a connection with airline prices, routes or services, pre-emption under § 41713 is mandated.

This is so regardless of whether the state statute specifically addresses the airline industry. See Morales, 504 U.S. at 386, 112 S. Ct. at 2038. Indeed, the Court explicitly rejected the notion that "the ADA imposes no constraints on laws of general applicability." Id. It said that:

> Besides creating an utterly irrational loophole (there is little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute), this notion similarly ignores the sweep of the "relating to" language. We have consistently rejected this precise argument in our ERISA cases: "[A] state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect."

Id. (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139, 111 S. Ct. 478, 483, 112 L. Ed. 2d 474 (1990)). Although Morales does not define with particularity the circumstances under which a state law "relates to" air carrier services, it clearly says that the requisite connection exists where "the law expressly references the air carrier's prices, routes or services, or has a 'forbidden significant effect' upon the same." United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 335 (1st Cir. 2003) (quoting Morales, 504 U.S. at 388, 112 S. Ct. at 2039). In this case, Florida's Whistleblower Act does not explicitly address

airline services; accordingly, the only possible basis for pre-emption is if it has a sufficient -- i.e., significant – impact on those services.

Notably, however, the Court recognized that there are limits on the scope of the ADA's "related to" language. Specifically, it said that "'[s]ome state actions may affect [airline prices, routes or services] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." Morales, 504 U.S. at 390, 112 S. Ct. at 2041 (quoting Shaw, 463 U.S. at 100 n.21, 103 S. Ct. at 2901 n.21); see also Public Health Trust of Dade County v. Lake Aircraft, Inc., 992 F.2d 291, 295 (11th Cir. 1993) ("Because [plaintiff's] design defect claims lie outside the pre-emptive reach of section 1305, we conclude that those claims are not pre-empted.").

Subsequently, in Wolens, the Court had an opportunity to apply § 1305(a) as partially defined in Morales. At issue in Wolens was whether Illinois's Consumer Fraud Act, a law of general applicability, was pre-empted by the ADA. In holding that it was, the Court said that the Consumer Fraud Act

> serves as a means to guide and police the marketing practices of the airlines; the Act does not simply give effect to bargains offered by the airlines and accepted by airline customers. In light of the full text of the pre-emption clause, and of the ADA's purpose to leave largely to the airlines themselves, and not at all to the States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services, we conclude that [section] 1305(a)(1) pre-

empts plaintiffs' claims under the Consumer Fraud Act.

Wolens, 513 U.S. at 228, 115 S. Ct. at 823-24.

For our purposes, Wolens is significant primarily for its explanation of the purposes of the ADA and because it directly ties the pre-emption inquiry to those purposes. In particular, it makes clear that through the ADA Congress sought to leave the bargained-for aspects of the air carrier-air passenger relationship to the workings of the market, i.e., to prevent the states from "impos[ing] their own public policies or theories of competition or regulation on the operations of an air carrier." Wolens, 513 U.S. at 229 n.5, 115 S. Ct. at 824 n.5 (citation and internal punctuation omitted). By reaching only airline prices, routes and services, § 41713 may be seen as defining -- albeit only generally -- the universe of such bargained-for elements of air carrier operations. This focus on the bargained-for aspects of air carrier service is perfectly consistent with the ADA's purpose of promoting competition within the airline industry; air carriers compete in only a limited range of contexts, e.g., fares, routes, timing, etc., which constitute the bargained-for elements of its service. Accordingly, to pre-empt state law claims concerning other elements of airline operations that are not bargained for plainly would not further the goal of promoting competition in the airline industry.

14

Although Wolens is thus helpful to the resolution of this case, the Court did not expand on Morales's definition of "related to," nor did it define "service [of an air carrier]," as used in the ADA's pre-emption clause. Accordingly, these definitional tasks fall to us. In tackling these questions, we bear in mind the important general maxim that in cases where the harm alleged is of a type that traditionally has been within the remedial province of the states, as is that alleged by Branche, see infra, "express preemption clauses must be construed narrowly." Irving v. Mazda Motor Corp., 136 F.3d 764, 767 (11th Cir. 1998) (citing Taylor v. Gen. Motors Corp., 875 F.2d 816, 823-24 (11th Cir. 1989)).

Like the Supreme Court, we never have defined the term "service," as used in § 41713. However, several other courts of appeals have weighed in on the meaning of the phrase "service of an air carrier." In Charas v. Trans World Airlines, Inc., an en banc panel of the Ninth Circuit held that "service" "refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided (as in, 'This airline provides service from Tucson to New York twice a day.')." 160 F.3d 1259, 1265-66 (9th Cir. 1998) (en banc), opinion amended on denial of reh'g by 169 F.3d 594

15

(9ᵗʰ Cir. 1999) (en banc).[6]  By contrast, the court held that "service" does not encompass things such as "the dispensing of food and drinks, flight attendant assistance, or the like."  Id. at 1266. The court held that this narrow reading of the term "service" was compelled because a broader construction "effectively would result in the pre-emption of virtually everything an airline does.  It seems clear to us that that is not what Congress intended."  Id.  Heavily influencing this reading of the ADA's pre-emption clause was the Ninth Circuit's conviction that the pre-emption of state tort law as applied to airlines would not further Congress's purpose of "avoid[ing] state interference with federal deregulation," id. at 1265, but rather would contradict the maxim that "pre-emption provisions are narrowly and strictly construed."  Id. at 1264.

The Third Circuit has agreed in general terms with the approach to ADA pre-emption set forth in Charas.  See Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186, 195 (3d Cir. 1998) (holding that "the plaintiff's defamation claims are not pre-empted and may, therefore, proceed.  Application of state law in these circumstances does not frustrate Congressional intent, nor does it impose a state utility-like regulation on the airlines.  We therefore conclude that the plaintiff's

---

[6]The amendment to Charas was factual in nature and did not involve any substantive legal facet of the en banc panel's original opinion.  See 169 F.3d at 594-95.

16

suit is simply 'too tenuous, remote, or peripheral' to be subject to pre-emption, even though Delta's statements refer to ticketing, arguably a 'service.'").

By contrast, the Fifth and Seventh Circuits have construed "service" more expansively. In Hodges v. Delta Airlines, Inc., the Fifth Circuit, sitting en banc, held as follows:

> "Services" generally represent a bargained-for or anticipated provision of labor from one party to another. If the element of bargain or agreement is incorporated in our understanding of services, it leads to a concern with the contractual arrangement between the airline and the user of the service. Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself. These matters are all appurtenant and necessarily included with the contract of carriage between the passenger or shipper and the airline. It is these [contractual] features of air transportation that we believe Congress intended to de-regulate as "services" and broadly to protect from state regulation.

44 F.3d 334, 336 (5th Cir. 1995) (en banc) (citation omitted); see also Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1433 (7th Cir. 1996) (adopting the definition of "services" set forth in Hodges).

Of these competing definitions, we believe that the Fifth Circuit's is more compelling. However, it is important to note that this is a distinction that does not make a dispositive difference in this case. For reasons that are more fully delineated infra, Branche's claim under Florida's Whistleblower Act is not pre-

17

empted under either definition of "services." Indeed, his claim cannot be said to relate in any meaningful way to the transportation of passengers from one location to another, and accordingly it does not affect "airline services" as defined by the Ninth and Third Circuits. Similarly, appellant's claim does not significantly affect any bargained-for element of air carrier operations, and accordingly it does not affect "airline services" even under the broader reading of this term taken by the Fifth and Seventh Circuits.

Nonetheless, because the ultimate question in this case is whether Branche's state Whistleblower Act claim significantly affects air carrier "services," we are required to adopt a definition of the term "services." The broader reading of this term is preferable for three primary reasons. First, we can perceive no textual justification for a more truncated reading of "service." As the Fifth Circuit recognized in Hodges, this word generally refers to any bargained-for exchange of an intangible benefit. Indeed, the relevant dictionary definition of "service" is extremely broad: "[A] useful labor that does not produce a tangible commodity." Webster's Third New International Dictionary 2075 (3d ed. 1961); see also Hodges, 44 F.3d at 337 n.6 (stating that "[s]pecific references to the words 'service' or 'services' in the Code of Federal Regulations governing airlines are too numerous to incorporate here," and setting forth several substantively diverse

18

examples). Importantly, there is nothing in the text of § 41713 indicating that Congress intended to deviate from this standard definition. See Morales, 504 U.S. at 383, 112 S. Ct. at 2036 (we "assum[e] that the ordinary meaning of that language [used by Congress in the ADA's pre-emption provision] accurately expresses the legislative purpose") (citation and quotation marks omitted).

Second, as the Supreme Court plainly explained in Morales, the ADA's pre-emption clause is properly afforded an extremely broad scope. See 504 U.S. at 383-84, 112 S. Ct. at 2037. The Ninth Circuit's reading of "services," we believe, tends to undermine this interpretive guideline set forth by the Supreme Court. Indeed, no matter how broadly we construe the term "related to," see Morales, 504 U.S. at 383, 112 S. Ct. at 2037, if the scope of that phrase's referent (the word "services") is sufficiently constricted, the scope of pre-emption under § 41713 will nonetheless be minimal.

Finally, and perhaps most significantly, we do not share the concern that a broad reading of "services" would result in the pre-emption of "virtually everything an airline does." Charas, 160 F.3d at 1266. As recognized in both Wolens and Hodges, the purpose of the ADA's pre-emption provision is to increase "reliance on competitive market forces rather than pervasive federal regulation." Hodges, 44 F.3d at 335; see also Wolens, 513 U.S. at 228, 115 S. Ct.

19

at 823. Plainly this purpose is not served by interpreting the term "services" to include those aspects of airline operations that are not bargained-for by carriers and their passengers. See Hodges, 44 F.3d at 336 ("'Services' generally represent a bargained-for . . . provision of labor from one party to another.") (citation omitted).

Indeed, as the Fifth Circuit recognized, "[a] facile analogy to Morales and the ERISA pre-emption cases could suggest that 'services' includes all aspects of the air carrier's 'utility' to its customers, hence, any state tort claim may 'relate to' services as a result of its indirect regulatory impact on the airline's practices." Hodges, 44 F.3d at 337-38. Thus, for example, state law personal injury claims are not pre-empted, as evidenced by the fact that the ADA requires airlines to carry liability insurance "sufficient to pay, not more than the amount of the insurance, for bodily injury to, or death of, an individual or for loss of, or damage to, property of others, resulting from the operation or maintenance of the aircraft . . . ." 49 U.S.C. § 41112(a). Unsurprisingly, airlines do not compete on the basis of likelihood of personal injury, i.e., onboard safety, and as such it does not undermine the pro-competitive purpose of the ADA, as set forth in Wolens, 513 U.S. at 230, 115 S. Ct. at 824, to permit states to regulate this aspect of air carrier operations.

Accordingly, we readily conclude that even if "services," as used in §

41713, is construed to encompass aspects of air carrier operations beyond the

transportation of passengers -- i.e., the trappings and incidents of that

transportation like on-board food and beverage services, ticketing and the like --

its definition is nonetheless still limited to the <u>bargained-for</u> aspects of airline

operations over which carriers compete. By contrast, those elements of air carrier

operations over which airlines do not compete are not "services" within the

meaning of the ADA's pre-emption provision, and state laws related to these

elements are not pre-empted. <u>See, e.g.</u>, <u>Alasady v. Northwest Airlines Corp.</u>, __ F.

Supp.2d __, __ (D. Minn. Mar. 3, 2003) ("[T]his Court concludes that 'services of

an air carrier' is best construed as the Fifth Circuit has done in <u>Hodges</u>. The

procedures used to move passengers from the terminal onto the plane in an orderly

fashion are an integral part of the customer's experience of air travel and are

considered in evaluating the quality of their flight. Boarding procedures are

relevant to competition in the airline industry. The Court therefore concludes that

the term 'service' in § 41713(b)(1) encompasses boarding procedures."); <u>Ducombs</u>

<u>v. Trans World Airlines</u>, 937 F. Supp. 897, 900 (N.D. Cal. 1996) ("The majority of

circuits that have dealt with the issue . . . have . . . defined the scope of 'services'

narrowly, limiting pre-emption to activity that is based on economic decisions and

21

that relates to the contractual features that are bargained for by passengers."). This limitation largely mitigates the concern with overexpanding the reach of the ADA's pre-emption provision.

In short, the phrase "related to the . . . services of an air carrier" means having a connection with or reference to the elements of air travel that are bargained for by passengers with air carriers. This includes not only the physical transportation of passengers, but also the incidents of that transportation over which air carriers compete. This connection can be established by showing that the state law in question either directly regulates such services or, as is relevant in this case, has a significant economic impact on them. See Morales, 504 U.S. at 388, 112 S. Ct. at 2039; Parise, 141 F.3d at 1465-66 ("For a law to be expressly preempted by the ADA, a state must 'enact or enforce a law that relates to airline rates, routes, or services, either by expressly referring to them or by having a significant economic effect upon them.'" (quoting Travel All Over the World, 73 F.3d at 1431)).

Just as state law personal injury actions generally have been held not to be pre-empted under the ADA, employment discrimination actions typically have been held to fall outside the scope of the ADA's pre-emption clause. See Newman v. Am. Airlines, Inc., 176 F.3d 1128, 1131 (9th Cir. 1999) (holding California law

22

barring physical disability discrimination is not pre-empted by the ADA); <u>Wellons v. Northwest Airlines, Inc.</u>, 165 F.3d 493, 495 (6th Cir. 1999) (holding that the plaintiff's race discrimination claim was not pre-empted); <u>Parise</u>, 141 F.3d at 1467-68 (holding that the plaintiff's age discrimination claim was not pre-empted by the ADA); <u>Aloha Islandair Inc. v. Tseu</u>, 128 F.3d 1301, 1303 (9th Cir. 1997) (holding Hawaii law barring physical disability discrimination is not pre-empted by the ADA); <u>Abdu-Brisson v. Delta Airlines, Inc.</u>, 128 F.3d 77, 84 (2d Cir. 1997) (holding New York law barring age discrimination was not pre-empted by the ADA).

It is true that an airline's employment decisions may have an incidental effect on its "services," as defined above, but as the Second Circuit observed in <u>Abdu-Brisson</u>, "[p]ermitting full operation of . . . [anti-]discrimination law[s] will not affect competition between airlines -- the primary concern underlying the ADA." 128 F.3d at 84. Indeed, employment standards fall squarely within the traditional police powers of the states, and as such should not be disturbed lightly. <u>See Hawaiian Airlines</u>, 512 U.S. at 252, 114 S. Ct. at 2243 ("Pre-emption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred.'" (quoting <u>Fort Halifax Packing Co. v. Coyne</u>, 482 U.S. 1, 21, 107 S. Ct. 2211, 2222, 96 L. Ed. 2d 1 (1987))); <u>see also Botz v. Omni Air Int'l</u>,

23

286 F.3d 488, 493 (8th Cir. 2002). These holdings bear significantly on whether Branche's claim of retaliatory firing is pre-empted; at its root, this case involves a simple employment discrimination claim, with the prohibited basis for termination being not any inherent characteristic of the employee such as race, gender or disability, but rather his undertaking of protected activity.

Several courts have considered the specific question presented in this case, i.e., whether a claim for retaliatory discharge is pre-empted under § 41713, and although they have recognized that such employment actions ultimately may affect in some way the transport of passengers or other incidents of "service," the majority of them have concluded that such claims are not pre-empted. See Anderson v. Am. Airlines, Inc., 2 F.3d 590, 597-98 (5th Cir. 1993) (holding that any connection between the claim for retaliatory discharge and airline "services" was too remote to give rise to ADA pre-emption); Espinosa v. Cont'l Airlines, 80 F. Supp. 2d 297, 301 (D.N.J. 2000) (rejecting the argument that the plaintiff's state whistleblower claim was pre-empted based on the fact that it "'related to' the quality of services rendered by an airline because it affect[ed] Continental's ability to discipline employees whose work is integral to 'air services' and to air safety"); Ruggiero v. AMR, Corp., __ F. Supp.2d __ (N.D. Cal. Sept. 12, 1995). But see Marlow v. AMR Servs. Corp., 870 F. Supp. 295, 299 (D. Haw. 1994) (holding that

24

the ADA did pre-empt a mechanic's claims that he was discharged in violation of state whistleblower act and state public policy, allegedly for reporting health and safety violations).

Put as simply as possible -- and setting aside for the moment the impact of Congress's enactment of the WPP on our ultimate holding in this case – given the particularities of Branche's claim that he was discharged for his post hoc reporting of Airtran's safety violations, we believe that this case is more analogous to the majority of those cited above, and hold that appellant's state law claim is not pre-empted by the ADA. This is so essentially because safety is not a basis on which airlines compete for passengers, and as such is not something for which air travelers bargain; it is implicit in every ticket sold by every carrier. Accordingly, it does not serve the purposes of the ADA to pre-empt state law employment claims related to safety. See Abdullah v. Am. Airlines, Inc., 181 F.3d 363, 373 (3d Cir. 1999) ("Safe operations . . . are a necessity for all airlines. Whether or not to conform to safety standards is not an option for airlines in choosing a mode of competition. For this reason, safety of an airline's operations would not appear to fall within the ambit of the ADA and its procompetition pre-emption clause."); Smith v. Am. West Airlines, Inc., 44 F.3d 344, 347 (5th Cir. 1995) ("[T]he Smiths' claim is that the safety of their flight was jeopardized by the airline's permitting a

visibly deranged man to board. If appellants ultimately recover damages, the judgment could affect the airline's ticket selling, training or security practices, but it would not regulate the economic or contractual aspects of boarding. Any such effect would be 'too tenuous, remote or peripheral' to be pre-empted by § 1305(a)(1).") (citation omitted); see also Lake Aircraft, 992 F.2d at 294-295 (tort claim for defective aircraft design not pre-empted because not related to airline services). Although some safety-related claims may be tied to air carrier services, the very fact that they concern safety, standing alone, is insufficient to demonstrate this nexus.[7]

---

[7]It is true that in Parise we offered in dicta some indication that we thought claims implicating air carriers' safety concerns were "related to" their services so as to give rise to ADA pre-emption. See 141 F.3d at 1466 ("Although we are cognizant of Delta's compelling assertion that the threatening behavior in which Parise allegedly engaged 'relates to' the valid safety concerns of an airline, we conclude that the district court erred in finding Parise's state age discrimination action to be preempted by the ADA."). However, we noted that these safety issues were raised only as a defense to Parise's age discrimination claim (i.e., "the real reason we fired him was that he was unsafe"), and that this diminished the force of Delta's argument for pre-emption. In this vein, we said that "[b]y way of illustration, if Parise had claimed that Delta discriminated against him on the basis of a mental illness that sometimes caused him to exhibit violent tendencies and had relied on a state civil rights statute protecting emotionally disabled individuals from termination due to their disability, Delta's argument in favor of pre-emption analytically would carry greater weight." Id. at 1466 n.3. Superficially, this hypothetical is similar to the claim actually advanced by Branche -- that he was fired in retaliation for his reporting of unsafe maintenance practices.

However, even were we to consider Parise's dicta to be binding, which plainly it is not, it would not require us to conclude that Branche's claim is pre-empted. There are two reasons for this. First, the connection between the claim of the plaintiff in the Parise hypothetical and airline services is much more direct than in the present case. Indeed, violent behavior aboard an airplane has great potential to disrupt the airline's primary transportation function, which is a "service" under even the restrictive definition set forth by the Ninth Circuit. Thus, a claim based on a termination for behaving violently is directly tied to this service. By contrast, as we explain

26

Thus, because Branche's state Whistleblower Act claim is fundamentally an employment discrimination claim that does not implicate any arena in which airlines compete, we conclude based on the foregoing analysis that his claim does not relate to the services of an air carrier within the meaning of § 41713, and consequently is not pre-empted under that section.

Importantly, however, there is one more issue that we must consider before ultimately resolving this pre-emption question. In 1999, subsequent to the majority of the decisions discussed above, Congress enacted as part of the ADA the WPP, 49 U.S.C. § 42121, which provides that:

> No air carrier . . . may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . .
>
>> (1) provided, caused to be provided, or is about to provide (with any knowledge of the employer) . . . to the employer or Federal Government information relating to any violation or alleged violation of any order, regulation, or standard of the [FAA] or any other

more fully, infra, Branche's claim that he was fired for his post hoc reporting of a diagnostic maneuver that violated FAA regulations lacks this type of direct connection. Second and more fundamentally, airlines certainly do not compete on the basis of which one is the least safe. Branche's claim is simply that he reported safety violations and was fired. This alleged punishment for taking safety maintenance measures plainly does not pertain in any respect to a ground on which airlines attempt to draw passengers. Quite the contrary, as one court has recognized, "a state law prohibiting retaliatory discharge for whistleblowing only furthers the federal interest in the safety of the airline industry by encouraging employers to report unsafe conditions." Espinosa, 80 F. Supp. 2d at 302.

> provision of Federal law relating to air carrier safety
> under this subtitle or any other law of the United States .
> . . .

49 U.S.C. § 42121(a).  This provision represents a federal analog to Florida's Whistleblower Act.[8]  In evaluating whether the WPP has any effect on the foregoing analysis, the question we must ask is whether any aspect of that statute explains the proper scope of the ADA's pre-emption clause to a degree sufficient to alter our conclusion that pre-emption is inappropriate here because Branche's claim does not relate to the bargained-for aspects of air carrier operations.

Congress's enactment of the WPP figured prominently in the district court's finding of pre-emption in this case and in Botz v. Omni Air Int'l, 286 F.3d 488 (8th Cir. 2002), the one circuit court decision handed down since the WPP's effective date to address ADA pre-emption in the context of a state whistleblower statute. Botz featured a claim brought by a flight attendant pursuant to Minnesota's

----

[8]This is not to say, however, that the procedures for filing a complaint under the WPP exactly mirror those provided by Florida's Whistleblower Act.  For example, under the WPP the plaintiff cannot directly file a civil action against his employer, but instead must file a complaint with the Secretary of Labor.  See 49 U.S.C. § 42121(b)(1).  The Secretary then assesses the merits of the complaint and can either find it to be without merit and deny it or, if the Secretary finds the complaint to be meritorious, can order abatement of the violation, reinstatement with back pay and/or compensatory damages.  See 49 U.S.C. § 42121(2) and (3).  Any party aggrieved by the Secretary's order may obtain review of that order in the appropriate circuit court of appeals.  Under Florida's Whistleblower Act, by contrast, plaintiffs are not required to negotiate these administrative obstacles to the adjudication of their claim in a judicial forum.  See Fla. Stat. 448.103(1)(a) ("An employee who has been the object of a retaliatory personnel action in violation of this act may institute a civil action in a court of competent jurisdiction . . . .").

whistleblower statute, under which employers are prohibited from subjecting employees to any adverse employment action in retaliation for the employee's refusal "to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation . . . ." 286 F.3d at 492 n.6 (citing Minn. Stat. § 181.932, subd. 1(c)).  Botz alleged that she had been fired in retaliation for refusing a flight assignment that she believed violated federal safety regulations.  The airline argued in response that Botz's claim was pre-empted under § 41713.  In analyzing this contention, the Eighth Circuit drew a straight line between a flight attendant's refusal to serve, federal regulations that prohibit the operation of a flight with fewer than a minimum number of flight attendants, and a resulting disruption of air service.  In essence, the court was especially concerned that the state whistleblower statute functionally ensured the plaintiff's ability to ground a plane, and thereby disrupt the airline's service.  It thus categorized Minnesota's statute as "a state law that granted a flight attendant or other air-carrier employee the right to refuse an assignment that is essential to a carrier's ability to provide its scheduled services." Id. at 496.  Accordingly, it held, this law was related to air carrier services within the meaning of § 41713. See id. at 496-97.

Notably, the court also found support for this holding in Congress's enactment of the WPP. It reasoned that in passing the WPP Congress sought to impose a "more predictable response to public air-safety complaints . . . than would likely be possible if it had granted review in the courts of the fifty States." Botz, 286 F.3d at 497. It then rejected Botz's argument that "the WPP was not intended to pre-empt State whistleblower protections because, if it had been, Congress could easily have made such pre-emption express by including language in the WPP indicating that it was a whistleblowing air-carrier employee's exclusive remedy." Id. It said:

> We think this turns the proper logic on its head. When it fashioned the WPP, Congress was surely aware of the ADA's express pre-emption provision. It was presumably aware, as well, that the Supreme Court had determined that the provision had a broad application and should be given an expansive interpretation. Given this, we would expect Congress to have directed language in the WPP to the issue of federal pre-emption only if it had been Congress's intent that the WPP not exert any pre-emptive effect upon state whistleblower provisions.

Id. Finally, the Eighth Circuit dismissed Botz's reliance on Espinosa, as well as several other cases that had rejected pre-emption arguments under the ADA in the context of retaliatory discharge claims, because "[e]ach of these cases . . . relie[d] on the fact -- a fact that is no longer true -- that the ADA provided no claim or

30

remedy for air-carrier employees discharged in retaliation for their whistleblowing conduct. Such employees now enjoy protection under the WPP." Id. at 497 n.9.

After carefully considering the reasoning employed in Botz and the enactment of the WPP, we remain convinced that Branche's whistleblower claim is not pre-empted. As for the connection between retaliatory discharge claims and airline services, we do not dispute the Eight Circuit's conclusion that the grounding of an airplane is related to airline services, in particular, the transport of passengers from one place to another. However, in this case, the connection -- or, indeed, the potential connection -- between Branche's actions and air carrier services is far more attenuated than in Botz. As the Eighth Circuit said, if a flight attendant refuses to fly and a replacement cannot be found, FAA regulations prevent the plane from leaving the gate, thereby disrupting service. Here, by contrast, we are not concerned with the withdrawal of clearance for a plane to take off based on mechanical concerns, but instead only with Branche's post hoc reporting of a FAA violation. The likely consequence of reporting an unauthorized high powered run (as opposed to the reporting of a malfunctioning engine) is an investigation by FAA officials into the practices of Airtran's TIA mechanics, but not the grounding of the plane, which presumably has either been mechanically cleared and flown away or grounded for mechanical reasons

31

independent of the subsequent report of the improper diagnostic procedure. Had Branche claimed that Airtran fired him in retaliation for refusing to allow a plane to take off due to safety concerns, this would present a situation closer to the one at issue in <u>Botz</u>. But that is not the claim before us.[9]

As for the enactment of the WPP, this statute says nothing whatsoever about pre-emption, an omission that is susceptible to more than one interpretation. We could say, as the <u>Botz</u> court did, that the absence of any discussion of pre-emption stemmed from a Congressional assumption that the ADA already pre-empted state whistleblower claims and that it was content with maintaining this status quo. Although this certainly is plausible, we believe that this interpretation ultimately is incorrect. Indeed, the basis for the Eighth Circuit's holding is simply that (1) at the time of the WPP's enactment Congress knew of the ADA's express pre-emption provision; and (2) it also was aware that the Supreme Court had interpreted this provision broadly.

Although the first premise is undoubtable, it also is not especially helpful. Congress's knowledge of the provision implies nothing about the legislature's

---

[9]As our employment of this analytical modality indicates, it is the specifics of the retaliation claim, not the whistleblower statute, that appropriately determine pre-emption. Thus, retaliation claims brought under state whistleblower statutes must be evaluated on a case-by-case basis to determine the connection between the action in question and airline services. In Branche's case, this evaluation reveals that this connection is extremely loose at best.

view of its scope.  As for the second, the Supreme Court has interpreted only the phrase "related to."  See Morales, 504 U.S. at 384, 112 S. Ct. at 2037.  To date it has not weighed in on the meaning of "air carrier services."  Moreover and more significantly, to the extent that Congress can be charged with cognizance of judicial views regarding the scope of § 41713, it must have known that the majority of courts to consider the issue found state law retaliatory discharge claims not to be pre-empted by the ADA.  Against this background, it becomes significantly less clear that in saying nothing about pre-emption in the WPP Congress was somehow indicating that it assumed state whistleblower claims to be pre-empted.  Indeed, an equally compelling argument could be made that Congress was indicating its acquiescence in the view that such state law claims are not pre-empted.  Because the WPP says nothing about pre-emption and this silence is ambiguous, we find its enactment less probative of Congressional intent regarding the pre-emption of state whistleblower claims than did the Eighth Circuit.

As for the desire to enact a uniform means of resolving whistleblower claims, to infer from the very enactment of a federal remedy that Congress also intended to pre-empt all remotely equivalent state law causes of action -- as distinguished from divining Congress's intent regarding the scope of its express pre-emption provision (which, as stated, is ambiguous) -- would be a species of

33

implied pre-emption, which we presume is inapplicable where the statute in question features an express pre-emption clause.[10]  See generally Cipollone, 505 U.S. at 517, 112 S. Ct. at 2618.  Simply stated, it is possible to point to a multitude of substantive contexts in which parallel state and federal remedies exist, see, e.g., Medtronic, Inc. v. Lohr, 518 U.S. 470, 496-97, 116 S. Ct. 2240, 2256, 135 L. Ed. 2d 700 (1996) (holding that a federal statutory remedy did not pre-empt "substantively identical" state law remedies for precisely the same conduct and harm), and the very enactment of a federal remedy, without more, cannot cause us to expand the scope of an express pre-emption provision to encompass and pre-empt all equivalent state remedies.  See generally id.

In deciding pre-emption, whether before or after the enactment of the WPP, the question we must answer remains the same:  Is the state law in question "related to" air carrier "services"?  Though we do not wish to understate the importance of this legislation, the WPP changed neither the nature of Florida's Whistleblower Act nor the language of the ADA's pre-emption provision in any meaningful way.  It simply added an additional remedy for plaintiffs seeking to

---

[10]Although as explained above a finding of implied pre-emption is not forbidden where such statutes are concerned, we perceive nothing in the WPP bearing in any significant way on Congress's intent to pre-empt state law claims against air carriers for retaliatory discharge that do not fall within the scope of the ADA's express pre-emption clause.

advance a retaliatory discharge claim.  Because the WPP says nothing about pre-emption, it leaves us in precisely the same position as we occupied before considering this statute; that is, it leaves us with our conclusion that the pre-emption of Branche's retaliatory discharge claim would not advance the pro-competitive goals of the ADA, as outlined by the Supreme Court in Wolens.  Put differently, the WPP did not render these claims any more related to the bargained-for aspects of air carrier operations over which the airlines compete.  As such, although the enactment of this statute renders the question of ADA pre-emption more difficult in this case, we do not believe that the WPP changed the legal landscape -- or that it illuminated the intent of Congress to pre-empt state law whistleblower claims -- to a degree sufficient to alter the conclusion that prior to its passage such claims were not pre-empted.

Because the district court erroneously concluded that Branche's state law whistleblower claim was pre-empted by the ADA, its summary judgment in favor of Airtran is vacated and this case is remanded for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

35