# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-1900

_____

John A. Watson, V,

*Plaintiff - Appellant,*

v.

Air Methods Corporation,

*Defendant - Appellee.*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 10, 2017
Filed: August 31, 2017

_____

Before RILEY, Chief Judge,[1] WOLLMAN, LOKEN, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, SHEPHERD, and KELLY, Circuit Judges, En Banc.

_____

_____

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

COLLOTON, Circuit Judge.

John Watson sued his former employer, Air Methods Corporation, in Missouri state court, alleging a common-law claim for wrongful discharge in violation of public policy. Watson alleged that he was a "whistleblower" who disclosed safety violations at the company, and that Air Methods retaliated against him by terminating his employment. Air Methods removed the case to federal court and then moved to dismiss based on the pre-emption provision of the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1). The district court, relying on our decision in *Botz v. Omni Air International*, 286 F.3d 488 (8th Cir. 2002), dismissed the complaint, and Watson appeals. We now hold that the ADA does not expressly pre-empt Watson's state-law wrongful-discharge claims involving *post hoc* reporting of alleged violations of air-safety regulations.

I.

Air Methods operates flights and provides in-flight medical care for patients who require emergency air transportation to hospitals. The company maintains a fleet of 450 aircraft and qualifies as an "air carrier" for purposes of federal aviation regulations. 49 U.S.C. § 40102(a)(2).

From July 2013 until May 2014, Watson worked as a flight paramedic for Air Methods. Watson claims that during his employment with Air Methods, he observed numerous violations of federal aviation safety regulations. These included a pilot making cell-phone videos during flight, members of a medical crew text messaging during critical phases of flight, a pilot attempting to take off despite accumulation of frost and ice on the aircraft, and another pilot making unnecessary "run-on landings." Watson reported these alleged violations to Air Methods's corporate office. He asserts that the company responded by suspending him and later terminating his employment.

-2-

In August 2014, Watson sued Air Methods in Missouri state court for the common-law tort of wrongful discharge in violation of public policy. Under Missouri common law, an employer may not terminate an employee "for reporting wrongdoing or violations of law to superiors or public authorities." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. 2010). Air Methods removed the case to federal court, invoking jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332.

Air Methods then moved to dismiss the complaint on the ground that the ADA expressly pre-empted Watson's wrongful discharge claim. The district court granted the motion, concluding that this court's decision in *Botz* controlled the issue. On appeal, a panel of this court likewise concluded that the case was controlled by *Botz* and affirmed. *Watson v. Air Methods Corp.*, 834 F.3d 891 (8th Cir. 2016) (per curiam). We then granted Watson's petition for rehearing en banc to consider whether *Botz* should be reconsidered in relevant part. Whether Watson's claim is expressly pre-empted by the ADA is a question of law that we review *de novo*. *Kutten v. Bank of Am., N.A.*, 530 F.3d 669, 670 (8th Cir. 2008).

II.

In 1978, Congress passed the ADA "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services." Pub. L. No. 95-504, 92 Stat. 1705, 1705 (1978). Before the ADA, the Civil Aeronautics Board possessed broad power to regulate the interstate airline industry, including the authority to prescribe routes and fares. Federal Aviation Act of 1958, Pub. L. No. 85-726, tit. IV, 72 Stat. 731, 754-71 (1958). The ADA largely deregulated domestic air transportation and provided for the eventual termination of the Civil Aeronautics Board. 92 Stat. at 1744-54.

-3-

"To ensure that the States would not undo federal deregulation with regulation of their own," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992), the ADA contains an express pre-emption clause, providing in relevant part:

> [A] State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of an air carrier* that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1) (emphasis added). The clause applies to state statutes and state common-law claims. *Nw., Inc. v. Ginsberg*, 134 S. Ct. 1422, 1430 (2014).

In *Botz*, we construed the effect of the ADA pre-emption clause on a state whistleblower-protection law. There, a flight attendant refused to work both legs of an Alaska-to-Japan round trip because she believed the assignment violated a federal regulation concerning cabin crewmembers' working hours. *Botz*, 286 F.3d at 490 (citing 14 C.F.R. § 121.467 (2001)). She also reported to the airline her belief that the refused assignment, and a comparable assignment six months earlier, violated the regulation. *Id.* The airline fired the flight attendant for insubordination and refusing to accept an assignment, and she sued under the Minnesota whistleblower-protection statute. *Id.* at 490-91. The Minnesota law prohibited an employer from firing an employee who "in good faith, reports a violation, suspected violation, or planned violation" of federal or state law, or who "refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law." Minn. Stat. § 181.932, subd. 1(1), (3).

In concluding that the Minnesota statute "related to . . . service of an air carrier" within the meaning of § 41713(b)(1), this court focused first on the potentially disruptive effect of a crewmember refusing a work assignment. *Botz*, 286 F.3d at 494-95. Federal airline regulations set minimum staffing requirements for all

commercial flights, so a crewmember's refusal to fly will usually force an airline either to find a last-minute replacement or to cancel the flight. *Id.* at 494. Because a crewmember's refusal to fly creates a "significant likelihood" that the carrier will have to cancel that flight, we concluded that the Minnesota statute's authorization of such refusal had "a forbidden connection with an air carrier's service." *Id.* at 494-95. This reasoning was sufficient to demonstrate pre-emption of the flight attendant's whistleblower claim based on her refusal to work a scheduled shift.

In addressing the flight attendant's separate claim of retaliation based on her *post hoc* report of an alleged safety violation six months earlier, the *Botz* panel explained that its analysis of the ADA's pre-emptive effect was "bolstered by" the Whistleblower Protection Program of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("WPP"), 49 U.S.C. § 42121. 286 F.3d at 497. Enacted in 2000, the WPP amended the ADA to create what this court described as a "single, uniform scheme for responding to air-carrier employees' reports of air-safety violations." *Id.* Under the WPP, such complaints are to be adjudicated by the Secretary of Labor. The *Botz* panel thought the WPP's protections "illustrate the types of claims Congress intended the ADA to pre-empt." *Id.*

Although the WPP does not contain a pre-emption provision, *Botz* concluded that the enactment informed the scope of pre-emption under the ADA. The court reasoned that Congress, presumably aware of the broad pre-emptive scope of § 41713(b)(1), would have "directed language in the WPP to the issue of federal pre-emption only if it had been Congress's intent that the WPP *not* exert any pre-emptive effect upon state whistleblower provisions." *Id.* "In fashioning a single, uniform standard for dealing with employee complaints of air-safety violations," the court said, "Congress furthered its goal of ensuring that the price, availability, and efficiency of air transportation rely primarily upon market forces and competition rather than allowing them to be determined by fragmented and inconsistent state regulation." *Id.*

The court thus concluded that the WPP was "powerful evidence of Congress's clear and manifest intent to pre-empt state-law whistleblower claims related to air safety" through the ADA, *id.* at 496, and that the WPP dispelled "whatever doubt might possibly linger after a plain-language analysis of the ADA's pre-emption provision." *Id.* at 498. For these reasons, the court held that the plaintiff's claim involving her *post hoc* report of a safety violation was also pre-empted. The *Botz* panel decided the case based strictly on express pre-emption under the ADA, and found "no need to consider [the airline's] implied pre-emption arguments." *Id.* at 493.

*Botz* was the first federal appellate decision on express pre-emption of whistleblower claims. Since then, the Third, Ninth, and Eleventh Circuits each rejected *Botz*'s view that the ADA expressly pre-empts whistleblower claims based on *post hoc* air-safety reports. *Ventress v. Japan Airlines*, 603 F.3d 676, 683 (9th Cir. 2010); *Gary v. Air Grp., Inc.*, 397 F.3d 183, 189-90 (3d Cir. 2005); *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1258-64 (11th Cir. 2003). In particular, these circuits observed that the WPP did not change "the language of the ADA's pre-emption provision in any meaningful way," and disagreed with *Botz* that the WPP was probative of Congress's intent to pre-empt state laws. *Ventress*, 603 F.3d at 683 (quoting *Branche*, 342 F.3d at 1264); *Gary*, 397 F.3d at 190. We now consider whether the conflict between this circuit and the others should persist.

III.

Watson's state-law claim for wrongful discharge is premised on alleged retaliation by Air Methods for a *post hoc* report of a safety violation. Air Methods contends that Watson's Missouri common-law claim for wrongful discharge is expressly pre-empted as a provision "related to a price, route, or service of an air carrier." In determining the meaning of an express pre-emption provision, we apply no presumption against pre-emption, and we "focus on the plain wording of the

clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (internal quotation omitted).

As others have observed, however, the text of the ADA provision is "highly elastic and so of limited help." *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 86 (1st Cir. 2011) (citation omitted). We know from Supreme Court decisions that the pre-emption clause covers state laws "having a connection with or reference to airline 'rates, routes, or services.'" *Morales*, 504 U.S. at 384. The statute pre-empts both state laws specifically addressed to the airline industry and generally applicable laws that indirectly relate to air carriers' rates, routes, or services. *Id.* at 386. At the same time, however, some state actions may affect prices, routes, or services "in too tenuous, remote, or peripheral a manner to have pre-emptive effect." *Id.* at 390 (internal quotation omitted). "[T]he state laws whose 'effect' is 'forbidden' under federal law are those with a '*significant* impact' on carrier rates, routes, or services." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375 (2008) (quoting *Morales*, 504 U.S. at 388, 390)).[2]

Air Methods argues that Watson's wrongful-discharge claim is related to "service" of an air carrier. There is disagreement about the meaning of "service." Some courts say that it refers only to "such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided," *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265-66 (9th Cir. 1998) (en banc), while others construe the term more broadly to mean elements of

---

[2]The Federal Aviation Administration Authorization Act ("FAAAA") expressly pre-empts state laws "related to a price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1). The Court in *Rowe* applied *Morales* in examining FAAAA pre-emption, 552 U.S. at 370, and *Rowe* and other FAAAA cases are applicable to our interpretation of the ADA's pre-emption clause. *See Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 853 n.2 (8th Cir. 2009).

"the contractual arrangement between the airline and the user of the service," including—in the context of commercial airlines—"items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself." *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (quotation omitted); *see Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008) (per curiam) (comparing cases). Consistent with *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 226 (1995), which concluded that a passenger's claim related to upgrading travel classes was related to "service," we will assume for the sake of analysis that the broader meaning is correct—the contractual arrangement between the air carrier and the user of the service.

Air Methods, citing *Margiotta v. Christian Hospital Northeast Northwest*, 315 S.W.3d 342, 347-48 (Mo. 2010), argues that to succeed on a Missouri wrongful-discharge claim, a plaintiff must prove that he reported an actual violation of federal air-safety regulations. The company contends that if these claims are not pre-empted, then state courts will need to adjudicate the meaning of the federal regulations and determine whether particular conduct of an air carrier's employees violated the regulations. For example, in Watson's case, a court might have to rule on whether an airline pilot's recording of a cell-phone video during flight violated federal regulations, such that Watson was terminated for reporting a violation of federal law. The company reasons that because a state court's ruling could affect how the air carrier performs its services, a wrongful-discharge claim regarding air safety is "related to a . . . service of an air carrier" and expressly pre-empted under the ADA.

For several reasons, we think that any effect of Missouri wrongful-discharge claims on the contractual arrangement between an air carrier and the user of its service is too tenuous, remote, or peripheral to deem the claims expressly pre-empted by the ADA. First, if a plaintiff succeeds in a state wrongful-discharge action, the court does not order the defendant air carrier to modify its safety practices. The state common law prevents an air carrier from terminating an employee for reporting a

violation of safety rules. But the air carrier is not required to implement any subsidiary conclusion of a state court about the meaning of safety regulations. The requirement to retain employees who complain about practices deemed unlawful by a state court does not significantly impact the contractual service relationship between the air carrier and its customers, even if the carrier turns out to be correct that the complained-of practice is permitted by federal safety regulations.

Second, the whistleblower's *post hoc* complaint itself is not likely to affect significantly an air carrier's services. As another court aptly noted, the likely consequence of reporting an alleged safety violation is an investigation by FAA safety officials, not the grounding of flights, so the connection to any "service" is too remote and attenuated to fall within the scope of the ADA's pre-emption clause. *Branche*, 342 F.3d at 1263; *see also Ventress*, 603 F.3d at 683; *Gary*, 397 F.3d at 189. To be sure, the ADA pre-empts some state laws that have an "indirect" effect on air-carrier services, *Morales*, 504 U.S. at 386, but this does not mean that the strength or immediacy of the effect is irrelevant. At some point, the effect of a state action on a service is both indirect *and* too remote or insignificant to warrant pre-emption. *Id.* at 390; *cf. N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995).

Third, a wrongful-discharge claim is akin to claims arising under background employment laws that are not expressly pre-empted by the ADA. Laws regulating minimum wages, worker safety, and discrimination based on race, sex, or age may affect a carrier's costs, but they generally operate at a level "one or more steps away from the moment at which the firm offers its customer a service for a particular price." *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 558 (7th Cir. 2012); *see Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014); *DiFiore*, 646 F.3d at 87-88. Because ADA express pre-emption applies only when there is a "significant" impact on service, there is a general distinction between state laws that regulate "how [a] service is performed (preempted) and those that regulate

-9-

how an airline behaves as an employer or proprietor (not preempted)." *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 456 (1st Cir. 2014) (alteration in original) (internal quotation omitted); *see Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1055 (7th Cir. 2016). Laws of general applicability can be pre-empted by the ADA, *Morales*, 504 U.S. at 386, but the pre-emption clause should be understood in light of its purpose to promote competition in the industry. *S.C. Johnson*, 697 F.3d at 559. A whistleblower's wrongful-discharge claim—like a claim alleging race or age discrimination—does not frustrate the ADA's primary economic objectives. *Abdu-Brisson v. Delta Airlines, Inc.*, 128 F.3d 77, 84 (2d Cir. 1997); *see Wellons v. Nw. Airlines, Inc.*, 165 F.3d 493, 496 (6th Cir. 1999).

Fourth, Air Methods raises concern about a supposed "patchwork" scheme of safety standards that would result from state tort decisions, but the argument falters on the peripheral connection between wrongful-discharge litigation and air-carrier service. Laws related to "safety" are not synonymous with laws related to "service." It is unlikely, for example, that all personal-injury claims against air carriers based on unsafe operations or maintenance are expressly pre-empted by the ADA, given that federal law requires carriers to maintain insurance for bodily injury, death, or property damages resulting from "the operation or maintenance of the aircraft." 49 U.S.C. § 41112(a); *see Wolens*, 513 U.S. at 231 n.7; *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 194 (3d Cir. 1998). Congress was concerned with variations in state law only insofar as they relate to a *price, route, or service* of an air carrier. *See Dilts*, 769 F.3d at 647-48. The Third, Ninth, and Eleventh Circuits, encompassing 15 States, important airline hubs, and a more than a third of the nation's population, have for years allowed state whistleblower claims based on *post hoc* air-safety complaints. Yet Air Methods has referred us to no evidence that state-law decisions touching on safety have had a significant impact on air-carrier *service* in those jurisdictions.

Fifth, the Whistleblower Protection Program does not demonstrate that Watson's claim is expressly pre-empted under the ADA. This court in *Botz*

concluded that the WPP "bolstered" the ADA's pre-emptive effect and made it "unmistakable" that safety-related whistleblower claims were pre-empted by the ADA. The rationale was that the WPP evidenced Congress's desire to make federal law the exclusive vehicle for air-safety whistleblowers. 286 F.3d at 497. Other circuits have rejected that reasoning, and we are persuaded to abandon it. *See Ventress*, 603 F.3d at 683 (9th Cir.); *Gary*, 397 F.3d at 190 (3d Cir.); *Branche*, 342 F.3d at 1264 (11th Cir.). We ordinarily do not infer pre-emption from the mere existence of a federal enforcement mechanism. *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973). And we are skeptical that Congress, between passage of the ADA in 1978 and enactment of the WPP in 2000, had adopted a pre-emption regime that left air-safety whistleblowers without judicial recourse against retaliation by their employers. *Cf. Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984); *Hodges*, 44 F.3d at 338. We therefore conclude that the WPP did not change the ADA's pre-emptive scope in a material way.

For the foregoing reasons, we hold that the ADA does not expressly pre-empt Watson's wrongful-discharge "whistleblower" claim involving *post hoc* safety reports to the air carrier. We thus overrule *Botz* in relevant part.

After we granted rehearing en banc, Air Methods argued in a supplemental brief and at oral argument that Watson's claim is impliedly pre-empted by the WPP and by the Federal Aviation Act of 1958. These arguments were not raised in the district court, where *Botz* was then controlling, and were mentioned only in part and fleetingly before the three-judge panel. We decline to consider them in the first instance as an en banc court.

*        *        *

The judgment of the district court is vacated, and the case is remanded for further proceedings.

_____

-11-